# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
ANTHONY NAVARRO,
Defendant and Appellant.

S165195

Orange County Superior Court
02NF3143

October 28, 2021

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Corrigan, Liu, Cuéllar, Kruger, Groban, and Jenkins concurred.

PEOPLE v. NAVARRO

S165195

Opinion of the Court by Cantil-Sakauye, C. J.

A jury convicted defendant Anthony Navarro of the first degree murder of David Montemayor and of conspiracy to commit his murder (Pen. Code, §§ 182, subd. (a)(1), 187, subd. (a)),[1] as well as participation in a criminal street gang (§ 186.22, subd. (a)). The jury found true the special circumstance allegations that the murder was committed in the course of a robbery (§ 190.2, subd. (a)(17)(A)) and in the course of a kidnapping (§ 190.2, subd. (a)(17)(B)) and was committed to further the activities of a criminal gang (§ 190.2, subd. (a)(22)).

Following the penalty phase of the trial, the jury returned a verdict of death. Defendant moved for a new trial and for modification of his sentence to life without the possibility of parole. The trial court denied those motions and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment.

## I. FACTS

### A. Guilt Phase Evidence

#### 1. Prosecution evidence

The murder victim, David Montemayor, was the manager and part owner of a trucking company, Interfreight Transport,

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

located in Rancho Dominguez. Montemayor's sister, Deborah Perna, who also worked at Interfreight, disliked her brother. She believed that Montemayor was embezzling funds from the company and storing the cash in coffee cans in his garage.

In early 2002, Perna hired Edelmira Corona to work as an office assistant at Interfreight. Around May that year, Perna asked Corona if she knew anyone who could have Montemayor killed.[2] Corona put her off, but Perna was persistent. At some point, Perna gave Corona a handwritten note bearing Montemayor's home address and telephone number and asked again whether Corona could arrange for Montemayor's killing. Corona was again noncommittal and stashed the note in her desk.

According to Corona, she introduced defendant to Perna in August 2002, when he came to Interfreight to deliver methamphetamine to Corona.[3] Soon after, Perna suggested that Corona give defendant the note with Montemayor's address and phone number and ask him to kill her brother. When

---

[2] Although it is not clear why Perna believed Corona could arrange for a killing, the evidence at trial suggested that Corona's father is a high-ranking member of a criminal gang.

[3] Corona was the only person involved in the killing to testify at trial, besides defendant himself. Four other participants — Perna and three others, whose roles are discussed subsequently — were convicted of the murder after separate trials. The convictions of Perna and one of the other participants have been affirmed on appeal. (*People v. Perna* (July 23, 2007, G036905 [nonpub. opn.]; *People v. Lopez* (July 23, 2007, G0371693 [nonpub. opn.].) The other two were sentenced to death, and their automatic appeals are pending before this court. (*People v. Alberto Martinez*, S185364, app. pending; *People v. Armando Macias*, S196185, app. pending.)

Corona saw defendant later and he inquired about Perna, Corona told him that Perna had seen his tattoos and suggested Corona hire him to kill Montemayor. Defendant merely laughed.

In mid-August, defendant drove Corona to northern California to visit her father, an inmate at the state prison at Pelican Bay, and her then-boyfriend, who was jailed in Humboldt County. Corona told defendant that her father was a leader in the Mexican Mafia, a southern California prison gang. During the drive, Corona received a call from Perna. When Perna learned Corona was with defendant, she asked whether Corona had mentioned the killing of Montemayor. When Corona told defendant about the conversation, he asked for Montemayor's address, but Corona did not have the address with her.

Corona and defendant made plans to meet about another matter a week later, and defendant asked Corona to bring Perna's handwritten note to the meeting. Before giving defendant the note that day, Corona wrote "one hand" on it, indicating that Montemayor was an amputee. She also told defendant that Perna said he could keep anything he found in Montemayor's home, in particular the cash Perna believed was hidden in the garage. When Corona told defendant that Perna wanted him to make Montemayor "disappear," he responded, "yes."

During a later phone call, Corona asked defendant about the note. He said he had lost it and asked her to get him the information again, but she never did so. In early September, Perna asked Corona when defendant was going to kill Montemayor. Corona told her defendant had lost the note and

"wasn't doing anything." Corona never again spoke with defendant about Montemayor's killing, she testified. Although Perna continued to talk to Corona about having Montemayor killed, Corona "would just laugh at her." Corona ceased working at Interfreight soon after, on September 17, 2002.

Montemayor's weekday routine was to leave his Orange County home at 6:00 a.m., drive to Interfreight in his Ford Expedition, and open the business. On the morning of October 2, the business was already open when the other employees began to arrive, but Montemayor was not there. Around 6:45 a.m., a neighbor spotted Montemayor's Expedition driving down the street near his home, followed closely by another SUV. A few minutes later, shortly before 7:00 a.m., near an intersection about a half-mile from Montemayor's home, several gunshots were heard. Police found Montemayor's body lying near his Expedition, along with spent bullet casings. He had been killed by a gunshot to the head.

At the time of the shooting, the driver of a vehicle near the intersection saw two men running around a vehicle, one of them firing a handgun. The two men entered a blue Chevrolet Blazer with a license plate containing "3L" and drove off. Soon after, a police officer driving an unmarked car spotted a Chevrolet Blazer matching the description of the vehicle seen at the site of the shooting. After a high-speed chase, during which two firearms were thrown from the Blazer, police arrested the three occupants, Armando Macias, Alberto Martinez, and Gerardo Lopez. One of the handguns thrown from the vehicle was later matched to the bullet that killed Montemayor, and the other gun was linked to a bullet and spent casings found at the scene of the shooting.

As he was being apprehended, Macias threw a cell phone into nearby bushes; police later found that the cell phone was registered to defendant's girlfriend.[4] The phone dropped by Macias was determined to have been in contact with a cell phone used by defendant 18 times in the hour and one-half surrounding the killing. Macias was also found to have a business card in his wallet. Handwritten on the back was defendant's gang moniker and the number of another cell phone linked to defendant. Martinez's wallet contained a piece of paper with "Anthony Navarro" written on it, along with defendant's auto club membership number.

On the day before Montemayor's killing, Macias had rented a car. Investigating police found Macias's rented car parked in front of defendant's home. The Blazer used by the three was registered at the address of defendant's home, although not in defendant's name. Around 9:00 a.m. on the morning of the killing, defendant's wife called police to report that the Blazer had been stolen, but a subsequent search of the Blazer revealed keys in the ignition and no signs of forced entry. The registered owner of the Blazer never sought its release from police impoundment after the killing.

In subsequent testimony, defendant acknowledged that he maintained a series of cell phones for the use of gang members who worked with him.[5] Telephone records showed that one of

---

[4]     Although defendant was married at the time of the killing, he was romantically involved with another woman, whom we will refer to as his girlfriend.

[5]     In addition to the cell phone dropped by Macias, three other numbers were registered to defendant's girlfriend. A

the cell phones linked to defendant, with a number ending in "1600," was in repeated contact with cell phones linked to Corona, defendant's wife, defendant's girlfriend, Macias, and Martinez in the hours preceding Montemayor's killing. In particular, the records show that Corona called the 1600 phone at 5:00 p.m. on the evening prior to the homicide. Later that evening, the phone was used to make repeated calls to defendant's wife and Corona. Beginning around 11:00 p.m., the 1600 phone recorded multiple calls to Macias and Martinez, followed throughout the night by more calls to Corona, Macias, and defendant's wife. Early the following morning, the 1600 phone was used to call Macias and Corona. The next day, a person who identified herself as "Mrs. Johnston" called customer service of the Nextel mobile phone company and changed the number assigned to the 1600 cell phone; defendant's wife's cell phone records reflected calls to Nextel around that time. In addition, Corona attempted to call Macias four times around 6:30 a.m. on the morning Montemayor was killed. Her last call connected and lasted for a minute.

Two weeks later, police stopped defendant while he was driving a Lexus vehicle. In the glove compartment of the Lexus were Perna's handwritten note with Montemayor's address and phone number and a CD case containing a photograph of Corona. During the stop, defendant confirmed to a detective that he was "an older member or elder member" of the Pacoima Flats street gang. Following his arrest in connection with Montemayor's murder, defendant wrote several letters from jail

---

mechanic who lived at defendant's home prior to the killing, Daniel Johnston, testified that defendant used four of the five cell phone numbers registered in Johnston's name.

suggesting his involvement in gang activities. Among these were letters to both Macias and Martinez expressing affection and discussing personal matters.

A local police detective, Nathaniel Booth, testified as an expert concerning matters relating to street gangs. Booth was a member of the gang unit of the Buena Park police department and had participated in a search of defendant's home during its investigation of the Montemayor killing. He testified that gang members are expected to "put[] in work" for the gang by committing crimes or violence for the benefit of the gang. Older members of the gang "often are more like supervisors," with younger members committing "the majority of the violent crime" in order to prove their mettle.

Booth testified that gangs generally acquire a name, which often refers to the neighborhood in which they operate, and individual members are given monikers used within the gang. Graffiti is used to promote the gang or individual members, mark turf, and challenge other gangs. One form of graffiti is the "roll call," in which a gang member records a list of the gang members with which that member regularly associates. Tattoos are also used to indicate gang membership and identity. Citing several of defendant's tattoos, Booth identified him as a member of the Pacoima Flats gang, which is affiliated with the Mexican Mafia. When Booth searched defendant's residence, he saw words spray painted and written on the walls of the garage in the manner of graffiti. Among others, these illustrated the words or terms PF, Droop, Droops, Droop Baby, Lil Droops, Crook, Pirate, Lil Pirate, Chito, Blackie, D'Sta, Dee, and Weaz. Booth identified "Droopy" as defendant's gang moniker, while Crook and Pirate are the monikers of Martinez and Macias, respectively, both of whom Booth also

identified as Pacoima Flats gang members.[6] He identified this graffiti as a "very short" roll call, identifying a series of members who "associate together within the gang." Booth also identified Lopez as a member of the Pacoima Flats gang. Based on this and other information, Booth concluded that defendant, Martinez, Macias, and Lopez were all members of the Pacoima Flats gang at the time of Montemayor's killing and that Montemayor was killed for the benefit of the gang.

### 2. *Defense evidence*

Defendant testified that he became a member of the Pacoima Flats gang in 1978, at the age of 12. He decided to become an informer for the Federal Bureau of Investigation (FBI) in 2000, after the Mexican Mafia killed his cousin. Thereafter, he cooperated with the Los Angeles office of the FBI from April to October 2000, the San Diego office of the FBI from November 2000 to November 2001, and the Bureau of Alcohol, Tobacco, and Firearms (ATF) for two months in mid-2002.

As an aspect of his cooperation, defendant attended meetings of members of the Mexican Mafia while wearing a listening device and camera. He was able to relate extensive information about planned gang activities. Defendant was also provided funds by the FBI that he turned over to a senior member of the Mexican Mafia, passing the money off as protection payments extorted from other gang members, referred to as "rent." This enhanced defendant's status in the

---

[6] Subsequently, during cross-examination, defendant acknowledged that his home was a "hangout" and that "Crook" and "Lil Pirate 2," painted on the garage walls, referred to Martinez and Macias, respectively. "D'Sta" referred to defendant.

gang, which in turn increased his effectiveness as an informant. Defendant was declared by the gang to be a *llavero*, or "key holder," effectively the top gang member in an assigned portion of Pacoima. Defendant acknowledged that he maintained "at least nine" cell phones at this time. He permitted others to use the phones, which helped him keep track of his fellow gang members.

Defendant believed that he began to be viewed with suspicion within the gang no later than March 2002, when he was arrested for possession of a firearm by a felon, a potential third strike crime, but was released on low bail and never formally charged. He received the lenient treatment because of his status as an informant. The Los Angeles FBI terminated defendant as an informant in 2000 because it learned that rumors of his cooperation were circulating within the gang.

Defendant said he first met Corona in April 2002, when Macias introduced her to him. Corona told him she was the daughter of Felipe Vivar, a "mafia boss" whom defendant knew by reputation, and that Vivar had put her in charge of gang activities in the area. Corona told defendant that Vivar wanted him to commit a killing in Orange County. By that time, defendant had been terminated as an informant, was no longer receiving government funds, and had stopped making rent payments to the gang. He was concerned that the gang assumed he was collecting and withholding the payments and had ordered his killing.

In June 2002, defendant was the victim of a freeway shooting, which he interpreted as a warning from the gang. He sought a second meeting with Corona, hoping that she could help him set things right. Corona told him she could arrange for

the removal of an order for defendant's death, imposed by the gang, for a payment of $14,000. Defendant only had $7,000, which he gave to her. On this occasion, Corona gave him Perna's handwritten note with Montemayor's address and asked him to arrange for the killing, telling him the victim owed Vivar money. Defendant believed that she also told him the intended victim was her boss. "One hand" was written on the note, but defendant did not ask what it meant. Defendant put the note in the glove compartment of his Lexus.

After this meeting, defendant attempted to report the requested killing to his handler for the ATF, James Starkey, but Starkey told defendant he was too busy and instructed defendant to contact Rod Rodriguez, a Los Angeles police detective with whom defendant had also worked. Defendant thereafter spoke with Rodriguez and told him that Vivar's daughter said Vivar "wanted somebody from the San Fernando area to come out to Orange County to kill somebody." Defendant told Rodriguez he did not know the name of the victim but had his address. Because the note with the address was in his car, defendant was unable to provide Rodriguez the address, nor did he provide Corona's phone number. Rodriguez instructed him to find out the name of the intended victim, telling defendant he could not do anything without that name.

Defendant acknowledged driving to northern California with Corona, characterizing the trip as a further attempt to straighten out his relations with the gang, as well as to get more information about the requested killing for Detective Rodriguez. During the drive, Corona told defendant about the money thought to be hidden in Montemayor's garage, but she refused to give him the victim's name. This time, rather than asking defendant to commit the killing, Corona suggested that he "get

some homies to do it." Defendant thought she was not serious. Two weeks later, Corona paged defendant. When he returned her call, she asked, "Are you going to do this?" He told her he needed the address again, claiming he had lost the note. Although she said she would get back to him with the address, she never did. Defendant testified that by the time of this conversation with Corona he had forgotten where he left the note and did not remember until it was found in the police search.

Defendant testified that he believed the prosecution's theory of the crime was implausible because no senior gang member would permit a car registered at his address to be used in a killing; the same is true regarding his cell phones. Further, by the time of the killing defendant believed he was regarded as a turncoat by the gang. Defendant had been shot at twice while driving on the freeway, suffering a wound the second time. In addition, his car was shot at while being driven by a friend. After his arrest, defendant was attacked by Macias and Lopez while detained in a holding cell. They stabbed him eleven times, calling him a "rat."

The account by defendant of his activities as an informant was largely corroborated by the testimony of law enforcement agents from the FBI and ATF. Their recollections of defendant's communications about the Montemayor murder plot, however, differed from his own. Starkey confirmed that in early June 2002, defendant called him and said "somebody was going to hit somebody." Defendant was unable to provide any additional information, such as the potential victim, location, or timing of the killing. Starkey told defendant to get more information and to deal with Rodriguez because Starkey was busy with another matter. Starkey said that if defendant had provided sufficient

detail to support an investigation, he would have turned to it immediately.

When Rodriguez, a Los Angeles police detective in 2002, first met defendant, he was aware that defendant was regarded as an effective informant. Because defendant was, as Rodriguez characterized him, a "shot caller" in the gang, he was in a unique position to gather information. In July 2002, defendant called Rodriguez to ask if he was interested in "some type of a kidnap for ransom or a murder for hire case." At the time, defendant said he did not have any additional information. In particular, defendant did not mention Corona or the note with the victim's address and telephone number. Rodriguez told defendant he needed more information, such as the name of the victim, and asked defendant to find out as much additional information as he could. Defendant mentioned the matter again in a telephone call two weeks later, suggesting that the killing would occur in Orange County. Rodriguez said he needed more information to put defendant in touch with appropriate law enforcement officials in Orange County. Again, defendant did not provide any other information. He said he would get back to Rodriguez, but he never did.

## B. Penalty Phase Evidence

### 1. Prosecution case in aggravation

Laurie Fadness testified that in February 2002, several men entered her home and attacked three men — David Gallegos, Gallegos's cousin, and a roommate of Fadness. Fadness had left the house that evening. When she returned, she saw several unfamiliar vehicles parked in front, including a black SUV. As she approached the back door, she heard "two loud bangs." Entering, she saw several men scattering toward

the doors. One of them yelled, "Droopy, Jesse, let's go!" Gallegos and his cousin were bloody and in shock, and her house was a shambles.

Gallegos testified that five men entered Fadness's house that night. He identified all five, without naming defendant. When they entered, one of the men said to Gallegos's cousin, "Droopy wants to talk to you." The cousin responded that he had nothing to say to Droopy. At that point, the men began beating them, and Gallegos heard two gunshots. He later saw that his cousin had suffered a gunshot wound to the head. Gallegos acknowledged that he told police he heard the name "Droopy" that day and knew defendant by that name, but he said that defendant was not present.

Gallegos also testified regarding an incident about six weeks later, in March 2002. At that time, he was asked to deliver a letter to a member of the Pacoima Flats gang by a member of a rival gang. Two weeks after he made the delivery, Gallegos learned that Droopy wanted to talk to him. Gallegos was eventually taken to defendant's house at gunpoint. Defendant was in the garage with several other men, including the men to whom Gallegos had delivered the letter. Defendant asked about Gallegos's delivery of the letter. When Gallegos told them who had given it to him, defendant and the other men began to beat and torture him. Eventually, Gallegos heard defendant say, "He's got to go," after which Gallegos was taken away and shot 14 times. Gallegos identified defendant to police as one of the shooters in a photographic line up.

Paul Parent was a mechanic hired by defendant in September 2001 to service the vehicles of defendant, his family, and his friends. At defendant's insistence, Parent moved into

defendant's house two weeks later. Within a few weeks, Parent became frightened by activities at the house and attempted to leave. In retaliation, defendant and two other men beat Parent and broke his finger with a hammer. Defendant thereafter threatened to kill Parent if he did not return to work. A month later, Parent again attempted to get away from defendant's house. When his escape attempt failed, he was beaten again by defendant and four other men. Defendant beat Parent on at least two other occasions. In April, defendant gave Parent a van and granted him permission to leave, in return for Parent's assistance in moving defendant's household. Ten minutes after the move was complete, defendant called Parent and said, in a mocking tone, "Rudy is going to shoot you." About two minutes later, Parent was shot in the back. His recovery required six months of hospitalization.

Karensa Spellman met defendant through a friend and began selling defendant methamphetamine. At some point, defendant sought information from her about one of his rivals in the gang, whom she knew. When Spellman told defendant she had no information, he beat and kicked her repeatedly. He then locked Spellman in his garage, where she remained for two weeks without food before Parent helped her escape.

The prosecution also provided evidence of two prior adjudicated crimes. In 1983, when he was 16 years old, defendant participated with between 25 and 30 other gang members in the shooting of two rival gang members. There was no evidence that defendant was among the shooters, and he was convicted of voluntary manslaughter. In 1995, defendant arranged to meet Francisco Chavez in a parking lot to purchase some clothing. When defendant arrived, he and three other men

robbed Chavez and his wife at knifepoint. Defendant was convicted of second degree robbery with use of a weapon.

There was, in addition, testimony about the impact of Montemayor's death. His wife and daughters testified about their personal losses, and Montemayor's death led to the failure of Interfreight, putting its employees out of work.

### 2. *Defense case in mitigation*

Detective Rodriguez testified that defendant continued to act as an informant even after his arrest in this case, providing useful information to law enforcement. Two FBI agents provided additional detail about defendant's work as an informant for the FBI. His cooperation was valuable and was undertaken at great risk, placing the lives of both defendant and his family members in danger. For several years, defendant also had participated in outreach programs for youth directed at preventing gang participation. Defendant's brother and daughter testified about his positive role in their lives.

## II. DISCUSSION

### A. Guilt Phase Claims

#### 1. *Defendant's convictions are supported by the evidence*

Defendant's convictions are necessarily premised on a finding that he conspired with or acted as an accomplice to the actual killers to bring about Montemayor's murder. Defendant contends that the jury was not presented with sufficient evidence of his participation in such a conspiracy to support the convictions. We find sufficient evidence to support the jury's judgment.

"When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the

light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence — that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt." (*People v. Banks* (2015) 61 Cal.4th 788, 804 (*Banks*).) In doing so, we "view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence." (*People v. Reed* (2018) 4 Cal.5th 989, 1006 (*Reed*).) "We must also 'accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*People v. Flores* (2020) 9 Cal.5th 371, 411 (*Flores*).) We do not question the credibility of a witness's testimony, so long as it is "not inherently improbable," nor do we reconsider the weight to be given any particular item of evidence. (*Reed*, at p. 1006; see *id*. at p. 1007.)

" ' "Conspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy." ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 244 (*Dalton*).) " 'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime." ' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1111, italics omitted (*Thompson*).) "Evidence of an agreement does not require proof that the parties met and expressly agreed; a criminal conspiracy can be shown through circumstantial evidence." (*People v. Penunuri* (2018) 5 Cal.5th 126, 145.) "If the agreement between the conspirators is the crux of criminal

conspiracy, then the existence and nature of the relationship among the conspirators is undoubtedly relevant to whether such agreement was formed, particularly since such agreement must often be proved circumstantially. ' "The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 870, italics omitted (*Homick*).)

The testimony and forensic evidence, viewed in the light most favorable to the prosecution, demonstrated that Perna wanted her brother killed and solicited Corona's aid to that end. Corona, who had ties to the Mexican Mafia, contacted defendant, a well-positioned gang member, about that possibility. By Corona's account, she introduced Perna to defendant and later conveyed to him Perna's request for the killing. By defendant's account, Corona passed on a request, which could have been understood as a demand, for the killing from a highly placed member of the Mexican Mafia. Either way, it was not disputed that Corona solicited defendant to commit the murder, generally described the victim to him, and provided him a writing with the victim's address and telephone number. From defendant's acceptance of the note, which was still in his possession at the time of the murder, and Corona's description of his conduct in accepting it, the jury could have inferred that he was willing to consider undertaking the assignment.

Detective Booth testified that the typical street gang is disciplined and hierarchical. Junior members of the gang are expected to serve the interests of more senior members; senior members, in turn, leave the execution of criminal activities to more junior members. Defendant was a longtime member of the Pacoima Flats street gang. By his own admission, he was

regarded as a *llavero*, the chief gang member in a portion of Pacoima. His home was a gathering place for gang members, to whom he provided vehicles and cell phones. Yet at the time of the murder his standing within the gang was threatened by rumors that he was an informant and by his failure to maintain the rent payments. From this, the jury could have concluded that defendant had a non-financial motive to accomplish the murder, which could have shored up his deteriorating position in the gang.

Between two and six months after Corona first proposed the murder, Montemayor was killed by three gang members, all of whom were members of the same gang as defendant.[7] Two of the three were sufficiently close to defendant within the gang that their monikers were among those of a small number of associates painted on the walls of his garage. In committing the killing, these associates used a vehicle registered to defendant's address. In the hours prior to the shooting, two of the gang members were repeatedly in contact with cell phones associated with defendant and Corona.[8] Further, the 1600 cell phone linked to defendant was in constant communication with Macias, Martinez, Corona, and defendant's wife beginning on the evening prior to the killing, continuing through the night

---

[7] Corona testified that she first proposed the murder to defendant in August 2002, but his recollection was that the first conversation occurred in April.

[8] Although the Blazer and cell phone service plans were not in defendant's name, there was evidence that defendant registered his assets in the names of other persons, presumably to avoid the assets being traced to him. The jury could therefore have inferred that the Blazer and the various cell phones were controlled by defendant.

and into the early morning. After the killing, attempts were made to obscure the connection between defendant and the crime by reporting stolen the vehicle used in the killing and changing the number of the 1600 cell phone.

Accordingly, the evidence could be understood to demonstrate that: (1) defendant, a relatively senior member of the Pacoima Flats, a criminal street gang, was asked or directed to commit the Montemayor killing by Corona, whose father was a highly placed gang member; (2) defendant received and retained Montemayor's address and phone number from Corona; (3) Montemayor was subsequently killed by two Pacoima Flats gang members who were among a small group closely associated with defendant, along with a third member of the same gang; (4) these gang members were permitted to use and did use defendant's car and cell phones in committing the killing; (5) the two gang members closest to defendant were in repeated contact with him and Corona in the hours leading up to the killing; and (6) defendant was similarly in constant communication with these two and Corona in the twelve hours leading to the murder. This pattern is consistent with Detective Booth's testimony about street gang culture, in which, he said, older members tend to supervise, while younger members are tasked with the actual commission of violent crime.

As noted above, when reviewing the sufficiency of the evidence to support a criminal conviction, we apply a deferential standard. We view the evidence in the light most favorable to the prosecution and, taking that view, ask whether " ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*Banks*, *supra*, 61 Cal.4th at p. 804, italics omitted.) Given defendant's standing within the Pacoima Flats gang, a jury reasonably could

have inferred that the subordinates were enlisted to commit the crime on defendant's behalf.  Further, although there is no *direct* evidence that defendant conspired with the three gang members to commit the crime, a jury reasonably could have concluded beyond a reasonable doubt that defendant recruited and directed them and facilitated their commission of the killing, based on the shooters' gang relationship to defendant, their use of a vehicle registered to defendant's address, and the killers' repeated contact with him and Corona immediately before the killing.

Defendant offers several alternative, contrary interpretations of the evidence.  The interpretations vary in their plausibility, but our consideration of them is, in any event, constrained by our deferential standard of review.  We must accept the jury's verdict if it represents a rational conclusion from the evidence, and, for the reasons discussed above, we find it so.  We analyze defendant's interpretations below, while recognizing that, in the end, they address matters that were the jury's to resolve.

Defendant first contends that the foregoing evidence was sufficient to support only a "suspicion" that he "might" have been a member of the conspiracy.  This characterization underestimates the probative force of the evidence, which readily supported the conclusion that defendant was, in effect, the killers' boss in a criminal enterprise.  He was solicited to commit the killing; his subordinates committed the shooting using his property; and these subordinates were in repeated contact with him before and during the killing.  The inference that the gang members were working in concert with defendant therefore finds solid support in the evidence.  It is true, as defendant argues, that there was no direct evidence of his

personal participation past the point of his solicitation by Corona, but such evidence was not required. Given the nature of criminal conspiracies, it is often the case that there is no direct evidence of an agreement among the conspirators. (*Homick, supra,* 55 Cal.4th at p. 870 ["such agreement must often be proved circumstantially"].) Contrary to defendant's contention, direct evidence is unnecessary when, as here, the circumstantial evidence permits the jury to infer beyond a reasonable doubt that an agreement existed.

Defendant also contends that his mere association with the shooters is insufficient to support a finding that he conspired with them. (See, e.g., *Simmonds v. Superior Court* (1966) 245 Cal.App.2d 704, 708 ["the law recognizes that mere association or mere presence cannot alone furnish the basis for a charge of coconspiracy"].) That is correct as a principle of law, but the prosecution provided evidence of more than mere association. As noted above, it could be concluded that defendant had a personal motive to commit the killing; was, pursuant to his standing in the gang, the shooters' boss; permitted them to use his property in committing the crime; and was in communication with them before and at the time of the shooting.

Defendant suggests the killing was staged in a manner designed to frame him, perhaps because of the suspicions that he was an informant. As noted, he testified that no person in his position would knowingly permit gang underlings to use his car in committing a homicide or would communicate with those underlings by cell phone in the course of the crime. Although these aspects of the killing certainly inculpated defendant in the killing, the jury was not required to accept them as the result of an attempt to frame him. They could simply be explained as incaution.

The jury could also have discounted defendant's theory because the plot he outlined depended for its success on the shooters' apprehension. The forensic evidence used to implicate defendant was located because the killers were found in possession of it immediately after the homicide. Had the shooters not been spotted, chased, and arrested, police would not have been able to use Macias's cell phone to connect defendant to the crime. Nor would they have found the business card bearing defendant's gang moniker in Macias's wallet, and they might not have been able to identify the vehicle used. In other words, framing defendant in this manner would succeed only if the killers were caught soon after the killing. Accepting defendant's claim therefore required the jury to conclude that the killers' apprehension was an integral part of the plan to frame him. Although this is conceivable, the jury was by no means compelled to conclude that the evidence of defendant's involvement in the execution of the scheme was, in effect, fabricated.

Defendant contends that it "defies logic" to infer that he was involved in the killing after having told two law enforcement officers about it. Though defendant was free to argue, as he did, that this evidence was helpful to him, the jury was entitled to discount it. (See *Reed*, *supra*, 4 Cal.5th at p. 1007.) Defendant knew considerably more about the planned killing than he told the officers, including the involvement of Corona and the address and telephone number of the proposed victim. Yet he told the detectives little more than that a homicide would occur at some unspecified time in Orange County, perhaps involving unidentified gang "big homies." As a result, nothing defendant told the detectives would permit them to connect the crime, if and when it occurred, to him personally.

For this reason, the jury's conclusion that the reports did not preclude his subsequent participation in the murder was entirely rational.

Finally, defendant contends the evidence is "just as consistent" with his innocence and points to several circumstances that, he asserts, are inconsistent with his participation in the killing. In particular, defendant cites (1) his disclosures to law enforcement, (2) his move to Las Vegas prior to the killing, (3) the use of his vehicle in the crime, (4) the suspicions within the gang that he was an informant, and (5) his poor relations with his wife, who was a friend of Corona. We acknowledge that these factors, if accepted as true, weighed against the conclusion that defendant was involved in the killing. Our task in reviewing the sufficiency of the evidence to support a criminal conviction, however, is not to weigh the evidence to determine the most likely interpretation. Rather, we view the evidence and the reasonable inferences therefrom in the light most favorable to the jury's determination, taking at face value evidence that is not inherently improbable, and presuming the existence of every fact reasonably deduced from that evidence. (*Flores*, *supra*, 9 Cal.5th at p. 411; *Reed*, *supra*, 4 Cal.5th at p. 1006.) We ask not whether the jury's judgment was the most probable interpretation of the evidence, but simply whether it was a rational one. (*Banks*, *supra*, 61 Cal.4th at p. 804.) For the reasons discussed above, we conclude that the jury's judgment here was rational. None of the circumstances cited by defendant persuades us otherwise.

### 2. *Defendant failed to demonstrate that he withdrew from the conspiracy*

Defendant contends that, assuming he was involved in the homicide, he withdrew from the conspiracy by reporting the plan

to police. Simply as a matter of the law of withdrawal, defendant's conduct was insufficient. As defendant acknowledges, California law requires a withdrawing defendant to "'notify[] the other party or parties of whom he had knowledge of his intention to withdraw from the commission of the crime and . . . [do] everything in his power to prevent its commission.'" (*People v. Richardson* (2008) 43 Cal.4th 959, 1022, fn. omitted; see also *People v. Fayed* (2020) 9 Cal.5th 147, 178–179.) Putting aside the issue of notification, the evidence is clear that defendant did not do "everything in his power" to prevent the killing. Merely by disclosing to Rodriguez either Corona's involvement or the address and phone number of the intended victim, defendant could have prevented the killing. Instead, he withheld that information.

Defendant argues, alternatively, we should hold that "a person may withdraw from a conspiracy by communicating the pending plot to law enforcement," although he acknowledges that he is unaware of any California decision announcing such a rule of law. Even if we were to adopt his proposed rule, it would presumably require that the defendant make a more fulsome disclosure of the planned crime than occurred here. As discussed above, defendant disclosed no genuinely useful information to law enforcement, while withholding information that likely would have permitted the officers to prevent the killing — for example, the address and phone number of the victim or Corona's solicitation. We decline to rule that the limited nature of defendant's disclosure to the law enforcement officers was sufficient to constitute a withdrawal from the conspiracy.

> 3. *The evidence was sufficient to support the special circumstances for murder during a robbery and murder during a kidnapping*

Relying on our decision in *Banks*, *supra*, 61 Cal.4th 788, defendant contends the evidence was insufficient to support a finding that he was a "major participant" in the killing, as required by section 190.2, subdivision (d). Such evidence was unnecessary, however, because the jury necessarily found that defendant intended Montemayor's death.

Section 190.2, subdivision (d), states that a defendant can be sentenced under a felony murder special circumstance upon findings that the defendant was a "major participant" in the crime and acted with reckless indifference to life. In *Banks*, we applied this subdivision in concluding that a defendant who participated as the getaway driver in an armed robbery that resulted in a killing was a not "major participant" in the robbery. (*Id*., *supra*, 61 Cal.4th at p. 807; see *id*. at pp. 804–807.) Section 190.2, subdivision (d), however, applies *only* to defendants who lacked the intent to kill and did not actually kill. Section 190.2, subdivisions (b) and (c) subject defendants who were either the actual killer or possessed the intent to kill, respectively, to a felony murder special circumstance *without* the finding of further elements.

The clear distinction between this case and *Banks* is the underlying crime. The defendant in *Banks* participated in an armed robbery that incidentally involved a killing; defendant in the present case conspired to commit a murder that incidentally involved an attempted robbery and kidnapping. Although not all of the theories of murder on which defendant was tried required a finding of intent to kill, both conspiracy to murder and a special circumstance for murder committed for the benefit

of a criminal street gang require that finding. (E.g., *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 641, 642 (*Beck and Cruz*) [" 'all conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder' " and "conspiracy to commit murder may not be based on a theory of implied malice"]; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1144–1145 [street gang special circumstance requires intent to kill concerning a defendant who was not the actual killer].) The jury was so instructed.[9] In finding defendant guilty of conspiracy to murder and finding true the criminal street gang special circumstance, the jury necessarily found that he acted with the intent to kill Montemayor. Defendant was therefore subject to the felony murder special circumstances under section 190.2, subdivision (c).

Sufficient evidence supported the jury's finding that defendant possessed intent to kill. From the beginning, the result sought by Perna and Corona was Montemayor's death. Any kidnapping was merely a means to that end, and the robbery was intended to compensate the killers for their efforts. The jury was entitled to infer that in participating in this scheme, defendant knew and intended that Montemayor would be killed. Accordingly, neither *Banks* nor section 190.2, subdivision (d) provides a basis for reversing the special

---

[9] Conspiracy to murder, the jury was instructed, "requires proof that the conspirators harbored express malice aforethought, namely, the specific intent to kill." Regarding the special circumstance, the jury was instructed that it was required to find that "such defendant with the intent to kill counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder."

circumstance findings for murder in the course of a robbery or kidnapping.

### 4. Sanchez *error does not require reversal of defendant's gang-related conviction and special circumstance*

Because the trial featured testimony by an expert concerning gang activities, we requested that the parties file supplemental briefing addressing the possible application of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). In *Sanchez*, we held that "case-specific out-of-court statements" cited by an expert witness to support an expert opinion are offered for their truth. (*Id.* at p. 684.) Such evidence must therefore be admissible under an exception to the hearsay rule or supported by competent evidence in the record. (*Id.* at p. 686.) In a subsequent decision, we held that a claim of error from the admission of *Sanchez* hearsay is not forfeited by a defendant's failure to object at a trial that occurred prior to the issuance of *Sanchez.* (*People v. Perez* (2020) 9 Cal.5th 1, 9 (*Perez*).)

Defendant raises two issues under *Sanchez*. First, he contends the prosecution's gang expert, Detective Booth, relied on hearsay in testifying regarding defendant's gang affiliation. Second, defendant argues that because Booth's testimony about predicate criminal activity by members of the Pacoima Flats gang was based on hearsay, his gang-related conviction and special circumstance were not supported by the evidence. Assuming Booth's testimony regarding defendant's gang affiliation was admitted in violation of *Sanchez,* it was plainly harmless, given his own later admission of that membership. Although we agree with defendant that Booth's testimony about predicate criminal activity was inadmissible under *Sanchez,*

that error was harmless under the circumstances, for the reasons stated below.

### a. *Defendant's participation in the Pacoima Flats gang*

Defendant contends that Booth related the following items of case-specific hearsay in his testimony addressing defendant's gang affiliation: (1) defendant was a member of the Pacoima Flats gang; (2) defendant had been a member of the gang "all of his life"; and (3) defendant's moniker within the gang was "Droopy." Defendant is correct that Booth identified hearsay sources when testifying to these three matters, but that does not necessarily make the admission of the testimony error under *Sanchez.* Its admission was improper only if the expert's testimony about the case-specific facts was not otherwise supported by competent evidence in the record. (See *Sanchez, supra*, 63 Cal.4th at p. 686 ["What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception"].)

There was abundant competent evidence admitted at trial to demonstrate that defendant was a longtime member of the Pacoima Flats gang, notably including his own testimony, and that his moniker within the gang was Droopy. Because most of this evidence was admitted *after* Booth's testimony, however, it arguably cannot be cited to support admission of his testimony. (See, e.g., *People v. Jeffrey G.* (2017) 13 Cal.App.5th 501, 510 ["If prior unobjected testimony supported the prosecution experts' case-specific testimony, the testimony was not objectionable under *Sanchez*"].)

We need not resolve the propriety under *Sanchez* of the admission of Booth's testimony about defendant's gang activities because any error in the admission of this testimony was unquestionably harmless. In addressing the standard for harmless error in the *Sanchez* context, we must take into consideration whether the erroneously admitted hearsay evidence was "testimonial" for purposes of *Crawford v. Washington* (2004) 541 U.S. 36, 61. (See *Valencia, supra*, 11 Cal.5th at p. 840.) If so, we apply the federal constitutional standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), which requires reversal unless we conclude "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Id.* at p. 24; *Valencia*, at p. 840.) If not, we apply the state law standard of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), which requires reversal if it is reasonably probable the verdict would have been different had the error not occurred. (*Id.* at p. 836; *Valencia*, at p. 840.)

Here, we conclude that the admission of Booth's testimony about defendant's gang ties was harmless under either standard. Competent, credible evidence establishing his gang membership and moniker was ultimately admitted, including, as noted, defendant's own admissions. The jury therefore would have learned these facts independently of Booth's testimony.

### b. *Defendant's membership in a criminal street gang*

Defendant also contends that *Sanchez* was violated when Booth relied on hearsay in testifying with respect to various predicate gang crimes, assertedly resulting in insufficient evidence to support his gang-related conviction and special circumstance. Although we agree with defendant that some of

this evidence was admitted in violation of *Sanchez*, we conclude that its admission was harmless error.

In contending that the evidence was insufficient to support his convictions, defendant misunderstands the effect of a finding of *Sanchez* error. Evidence erroneously admitted is properly considered in weighing the sufficiency of evidence to support a conviction, notwithstanding its erroneous admission. (E.g., *People v. Story* (2009) 45 Cal.4th 1282, 1296–1297 [erroneously admitted evidence is considered in deciding whether the evidence at trial was sufficient to support a conviction, thereby permitting a retrial after a reversal for prejudicial error in the admission of the evidence]; see also *People v. Potts* (2019) 6 Cal.5th 1012, 1031 ["But the evidence here *was* admitted, and its probative value bears on the sufficiency of the evidence at trial"].) *Sanchez* error therefore does not affect the sufficiency of the evidence to convict. Instead, the question before us, as with any other erroneously admitted hearsay, is whether the error in admitting that evidence was prejudicial. Unlike a finding of insufficient evidence, a finding of prejudice does not bar retrial of the overturned conviction. (*People v. Hernandez* (2003) 30 Cal.4th 1, 6 ["As a general rule, it is well established that if the defendant secures on appeal a reversal of his conviction based on trial errors other than insufficiency of evidence, he is subject to retrial"].) We evaluate defendant's claim of error from this perspective.

To prove defendant's participation in a criminal street gang, it was necessary for the prosecution to establish that the Pacoima Flats gang qualified as a "criminal street gang" under the governing statute, section 186.22. That statute defines "criminal street gang" as a group "whose members individually or collectively engage in, or have engaged in, a pattern of

criminal gang activity," among other requirements. (§ 186.22, subd. (f).) In turn, a "pattern of criminal gang activity" is defined as the commission of two or more specific enumerated crimes, known as predicate offenses, by members of the gang.[10] (§ 186.22, subd. (e).) The circumstances of such predicate offenses are case-specific facts for purposes of *Sanchez*, and expert testimony about them must be supported by competent evidence. (*People v. Valencia* (2021) 11 Cal.5th 818, 839 (*Valencia*) ["facts concerning particular events and participants alleged to have been involved in predicate offenses . . . constitute case-specific facts that must be proved by independently admissible evidence"].)

To establish the commission of the predicate offenses constituting a pattern of criminal gang activity, Detective Booth testified about his examination of documents maintained by the Department of Corrections and Rehabilitation regarding the crimes committed by four men he identified as members of the Pacoima Flats gang. As defendant acknowledges, Booth's reliance on these materials to establish the commission of the predicate offenses did *not* violate *Sanchez* because the documents were admitted into evidence.[11]

Defendant persuasively argues, however, that Booth relied on hearsay materials in testifying that the men who committed these crimes were associated with the Pacoima Flats

---

[10] Although section 186.22 has been amended since Montemayor's killing, the same elements existed at the time. (See, e.g., *People v. Zermeno* (1999) 21 Cal.4th 927, 930 [citing the definition of a " 'pattern of criminal gang activity,' " from the then-current version of section 186.22, subd. (e)].)

[11] Defendant has not challenged the propriety of the court's ruling in admitting this evidence, and we do not consider it.

gang. Booth described the basis for his conclusion that each of the four were gang members as an "investigation" of their "backgrounds." He did not describe the nature of the investigations, other than that they involved a review of documents maintained by local law enforcement. Although Booth mentioned a few specific documents uncovered during the investigation and explained their role in his conclusions, many of the documents were not identified, and most of them appear not to have been introduced into evidence. The documents he identified that were in evidence — notably, four packets of documents relating to the crimes from the Department of Corrections and Rehabilitation — contain little or no information relevant to the gang membership of the men who committed the crimes. The admission of Booth's testimony that these men were members of the Pacoima Flats gang was therefore erroneous under *Sanchez*.

We conclude, however, that the error was harmless under either standard. (See *Valencia*, *supra*, 11 Cal.5th at p. 840.) In *People v. Turner* (2020) 10 Cal.5th 786 (*Turner*), which provides helpful guidance, an expert witness offered her opinion that a fetus killed by the defendant was viable at the time of its death, which was then an element of the crime of murder of a fetus. The conclusion was based on the contents of an autopsy report that was not admitted into evidence. We found admission of the expert's testimony on this point to have been in violation of *Sanchez*. Because there was little other evidence in the record to support the jury's presumed finding that the fetus was viable at the time of its death, we concluded that the defendant likely would have been acquitted of this charge in the absence of that testimony and reversed the fetal murder conviction. (*Id*. at pp. 821–825.)

A similar evaluation of prejudice here suggests two separate but related inquiries. The first, as in *Turner*, is whether there was sufficient evidence to support a finding that the Pacoima Flats gang satisfied the statutory requirements for a criminal street gang in the absence of Booth's testimony about the crimes of the four alleged gang members. If there was insufficient evidence to convict in the absence of the erroneously admitted testimony, the error cannot have been harmless. The second inquiry, assuming sufficient evidence existed in the absence of the error, is whether the jury's judgment nonetheless might have been different in the absence of Booth's testimony.

With respect to proof of the predicate offenses, the Attorney General argues that, in the absence of Booth's testimony, the jury would have been entitled to consider for this purpose the crimes committed by defendant and Montemayor's killers, citing *People v. Loeun* (1997) 17 Cal.4th 1 (*Loeun*). The defendant in *Loeun* and a fellow gang member each assaulted and struck a person they believed to be a member of a rival gang. (*Id*. at p. 6.) The jury convicted the defendant of assault with a deadly weapon and found true an allegation that the crime was committed for the benefit of a criminal street gang, despite the absence of proof of any other crimes committed by alleged gang members. (*Id*. at p. 7.) Acknowledging that the jury could consider evidence of his own crime, the defendant argued that "to establish the requisite 'pattern of criminal gang activity,' the prosecution must in addition present evidence of at least one *prior* offense of gang activity." (*Ibid*, italics in original.) We rejected the contention, finding the evidence at trial sufficient to support the enhancement allegation. As we explained, section 186.22 "allows the prosecution the choice of proving the requisite 'pattern of criminal gang activity' by evidence of 'two

or more' predicate offenses committed 'on separate occasions' *or* by evidence of such offenses committed 'by two or more persons' on the same occasion. Therefore, when the prosecution chooses to establish the requisite 'pattern' by evidence of 'two or more' predicate offenses committed on a single occasion by 'two or more persons,' it can, as here, rely on evidence of the defendant's commission of the charged offense and the contemporaneous commission of a second predicate offense by a fellow gang member." (*Id.* at p. 10, italics in original, fn. omitted; see also *People v. Tran* (2011) 51 Cal.4th 1040, 1046.)

Under *Loeun, supra*, 17 Cal.4th 1, the evidence of the crimes committed by defendant, Macias, Martinez, and Lopez in the course of the Montemayor killing was sufficient to support the jury's finding that the Pacoima Flats gang qualified as a criminal street gang. One of those crimes, of course, was the underlying homicide, a crime committed by defendant and all three direct participants. Further, as demonstrated by this jury's true finding of the two special circumstances, each also committed, at a minimum, attempted robbery and kidnapping.[12]

---

[12] Even if the evidence admitted at trial was insufficient to demonstrate that the three killers actually accomplished the robbery of Montemayor, both attempted and completed crimes qualify under section 186.22. (*Id.*, subd. (e) ["'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, . . . or conviction of two or more of the following offenses . . . ."].) The jury could have inferred from the evidence that Montemayor traveled to the office that morning, opened the office, and was kidnapped by the killers when they forced him to return home. In light of the evidence that defendant was told Montemayor

All of these crimes qualify as a predicate offense under section 186.22. (*Id.*, subds. (e)(2), (3), (15).) Ample evidence established that Macias and Martinez were members of the Pacoima Flats gang, including defendant's testimony that they were members of the gang and the presence of their gang monikers with his on his garage wall. Accordingly, even disregarding Booth's testimony, the record contained sufficient evidence of predicate offenses committed by members of the Pacoima Flats gang to satisfy section 186.22.

We further conclude that admission of Booth's testimony about the four individuals was harmless under either standard for assessing prejudice. (See *Valencia, supra*, 11 Cal.5th at p. 840.) Wholly apart from evidence sufficient to satisfy the statutory "pattern" requirement, voluminous evidence was offered at trial suggesting that the Pacoima Flats gang operated as a criminal gang. Defendant testified as much, describing for the jury his role in the gang and its activities. As he acknowledged, he acted as an informant for federal agencies investigating the gang's criminal activities, while acting as a leader in the gang. Booth offered similar, unobjectionable testimony. Because (1) the statute's technical requirements were satisfied by evidence of the crimes committed in connection with Montemayor's death and (2) there was copious other evidence that the Pacoima Flats gang operated as a street gang, the jury had no reason to hesitate in concluding that the Pacoima Flats gang qualified as a criminal street gang under

kept cash in a can at his house, the jury could have inferred that the killers' purpose in forcing Montemayor to return home was to rob him of that cash.

the law. Exclusion of Booth's testimony about the other four purported gang members would not have changed this result.

### 5. *The trial court did not abuse its discretion in anticipating potentially objectionable assertions in defendant's opening statement*

Prior to trial, the defense kept from the prosecution its decision to present testimony by defendant, but defense counsel disclosed this intent in confidence to the court. During an ex parte hearing shortly before the parties were to deliver their opening statements, the trial court discussed with defense counsel an outline of his planned opening statement. The court was concerned that a series of factual assertions contained in the outline had no obvious evidentiary source other than defendant's planned testimony. As the trial court recognized, the assertions might be viewed as objectionable by the prosecution, given its ignorance of defendant's intention to testify and the absence of any other known witness competent to testify about the assertions. In an effort to anticipate such objections, the court suggested that the defense either (1) disclose the potentially objectionable assertions to the prosecution, (2) disclose defendant's intent to testify, or (3) defer its opening statement until the close of the prosecution's case-in-chief. Defense counsel elected to defer the opening statement. Defendant now contends that the trial court rulings leading to this decision constituted a prejudicial abuse of discretion.

We find no error. The trial court's rulings were a reasonable and proper attempt to prevent a likely disruption of trial while preserving the confidentiality of defendant's intent to testify.

### a. Factual background

During pretrial proceedings, the prosecution lodged an objection to a defense proposal to elicit testimony from law enforcement officers Starkey and Rodriguez that defendant reported the possible killing to them. The prosecution contended that defendant's statements to the officers were both irrelevant and hearsay. After a lengthy but inconclusive hearing on the objection, defense counsel asked for an ex parte hearing in camera. There, counsel informed the court that defendant intended to testify, a tactical decision that counsel did not want to reveal to the prosecution. The court acknowledged that the officers' testimony might be admissible to corroborate defendant's testimony. The court declined to overrule the prosecution's objection on that basis, however, because "I don't know whether defendant [will] or will not take the stand until such time as he actually gets sworn in," given his constitutional right not to testify.

When the matter arose again in open court, the trial court ruled, without further explanation, that defendant's statements to Starkey and Rodriguez were inadmissible, but it couched the ruling as open to reconsideration during trial, recognizing that "there are several contingencies that could take place." As a result of the ruling, however, the court instructed the defense that it could not refer, during its opening statement, "to any alleged statement by the defendant to Starkey or Rodriguez."

Defense counsel again asked for an ex parte hearing, at which counsel reiterated the plan to present defendant's testimony. Although the court accepted counsel's representation, it continued to express the belief that a "legal standard" prevented it from making any ruling premised on

37

defendant's testimony because defendant could not be assumed to testify until he, in fact, took the stand. Over defense objection, the court adhered to its ruling regarding opening statement, although the court modified the ruling slightly to permit counsel to tell the jury that defendant spoke to Starkey and Rodriguez soon after speaking with Corona.

A week before the commencement of trial, the court had asked both parties to submit "a brief summary of your opening statement." The court did not explain the purpose of the request, but it appears to have been part of the court's efforts to organize and control the proceedings. On the day before opening statements were to be given, the court requested an ex parte hearing with defense counsel. During the hearing, the court told counsel that it had reviewed the outline of defendant's planned opening statement.[13] The court was concerned because "a large portion of [the planned opening statement] is really predicated on [defendant's testimony], and the prosecution is not aware that that's going to take place. That's going to trigger objections during your opening statement . . . ."[14] Further, the court

___

[13] The court's ex parte discussion of the outline with defense counsel was unusual, but the procedure has not been challenged by defendant. We make no ruling regarding the propriety of this aspect of the court's conduct.

[14] The trial court's concerns were well-founded. The outline of an opening statement submitted to the court relied heavily on defendant's anticipated testimony. In addition to describing Navarro's report to Starkey and Rodriguez, it provided an extended account of his work as an informant, including details that were likely known only to defendant. Further, the outline's account of defendant's dealings with Corona differed in some

explained, it would sustain an objection to assertions in the opening statement if no witness could be identified whose testimony would support them. The court suggested that, in order to maintain the confidentiality of defendant's intent to testify, "I'm prepared to defer your opening statement until the prosecution completes their case-in-chief." As the court noted, "The only other alternative I would have is a disclosure at this juncture and during your opening statement that you plan to call the defendant and he will testify."

During the ensuing discussion, the court identified several matters in defendant's proposed opening statement for which there was no obvious evidentiary source other than defendant. According to the court, these were found on a single page of the confidential outline. As a possible means of obviating the need to defer defendant's opening statement, the court suggested that defense counsel give the prosecution a copy of that page to determine whether the prosecution objected to any of the assertions. If the prosecution raised no valid objection, the court noted, "then I'm going to leave the opening statement alone." Although objecting to this approach, defense counsel tentatively agreed to the disclosure.[15] At this point in the hearing, the court

respects from her own account, and defendant was the only conceivable evidentiary source for these differences. Given the defense's decision not to disclose defendant's intended testimony, it was certainly possible, as the trial court feared, that portions of the opening statement would be challenged by the prosecution as unsupported by the testimony of known witnesses.

[15] This procedure would not necessarily have required the defense to reveal to the prosecution its plan to call defendant as

adjourned for lunch, with the express understanding that the defense could consider its options during the break.

When the ex parte hearing resumed, defense counsel immediately informed the court that, in light of its rulings, "I think we would like to withdraw the proposed opening statement that we intended to use and reserve the right to present to the court a new and different opening statement predicated upon what we hear in court from the People's case-in-chief, as well as what we intend to introduce on the defense." In response to a question from the court, counsel confirmed that defendant had decided to defer his opening statement until completion of the prosecution's case-in-chief.

### b. *Discussion*

" '[T]he function of an opening statement is not only to inform the jury of the expected evidence, but also to prepare the jurors to follow the evidence and more readily discern its materiality, force, and meaning.' " (*People v. Gurule* (2002) 28 Cal.4th 557, 610.) Although the assertions made in an opening statement do not constitute evidence (*Cox v. Griffin* (2019) 34 Cal.App.5th 440, 451), "the statement does offer a 'story line' into which the pieces of evidence should fit." (*People v. Harris* (1989) 47 Cal.3d 1047, 1085, fn. 19.) "[I]t is requisite that when [a party] elects to make an opening statement the facts shall be fairly presented by counsel, and that there shall be no statement of facts which he cannot, or will not, be permitted to prove." (*People v. Stoll* (1904) 143 Cal. 689, 693–694.) For that reason, counsel must have a good faith belief that

a witness, but the content of the outline would have made plain defendant's intent to testify.

the assertions in an opening statement are supported by evidence that is reasonably available and admissible. (*Hawk v. Superior Court* (1974) 42 Cal.App.3d 108, 121 (*Hawk*).) This principle is illustrated by *People v. Romero* (2007) 149 Cal.App.4th 29, which considered a claim that the trial court erred in permitting the defense to refer to self-defense in its opening statement only on the express condition that counsel knew the defendant would testify. The Court of Appeal held the condition appropriate because defendant and the deceased victim were the only witnesses to the crime. "Without testimony from [defendant], there would have been no evidence of the circumstances which led to [the victim's] death and hence no evidence to support a finding of self-defense." (*Id.* at p. 44.)

Under section 1044, the judge in a criminal trial has "the duty . . . to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." The statute "vests the trial court with broad discretion to control the conduct of a criminal trial." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).) With respect to closing argument, "the trial court retains the discretion to 'ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial.' " (*People v. Rhoades* (2019) 8 Cal.5th 393, 446.) We see no reason why the same rule should not apply to counsels' opening statements, with due regard for the different functions of those two presentations. We review an exercise of the court's authority in controlling the trial for abuse of discretion. (*People v. Edwards* (2013) 57 Cal.4th 658, 743.)

Defendant first contends the trial court erred in ruling that his attorney could not mention the content of defendant's communications with Starkey and Rodriguez in opening statement. We need not review the merits of this ruling, however, because it was never implemented. In defense counsel's opening statement, given at the close of the prosecution's case-in-chief, counsel was permitted, without objection, to describe the content of defendant's communications with Starkey and Rodriguez. Further, it is not clear that the court's ruling regarding the content of defendant's communications with Starkey and Rodriguez was a dispositive or even substantial factor in defendant's decision to defer his opening statement, which was motivated by an overarching desire to keep from the prosecution knowledge of his plan to testify. Even if the court had permitted mention of defendant's statements to Starkey and Rodriguez, the defense's underlying dilemma remained: The defense risked revelation of defendant's intent to testify because "a large portion" of defendant's planned opening statement, well beyond the mention of his discussions with Starkey and Rodriguez, was premised on defendant's own testimony.[16]

---

[16] Although we decline to review the merits of the trial court's ruling barring the defense from mentioning in opening statement the content of defendant's communications with the detectives, we share defendant's skepticism about the trial court's rationale. The court appeared to accept that the communications would be admissible if defendant testified, but it declined to adopt this justification because defendant had not yet taken the stand. With respect to inclusion of the communications in opening statement, however, the relevant consideration appears to have been defense counsel's *good faith*

With more pertinence, defendant contends that the trial court committed prejudicial error by forcing the deferral of his opening statement until after the prosecution's case in chief. Preliminarily, we note that there is nothing unprecedented about the deferral of an opening statement. As a matter of tactics, criminal defendants are expressly authorized to defer opening statement in this manner. (§ 1093, subd. (b) ["defendant or his or her counsel may . . . make an opening statement [at the beginning of trial], or may reserve the making of an opening statement until after introduction of the evidence in support of the charge"].)

We conclude that in making the rulings leading to deferral of the opening statement, the trial court acted within the bounds of its broad discretion to manage trial proceedings. The trial court's suggestion that it was prepared to defer the defense's opening statement was made in response to defendant's resolve not to inform the  prosecution of his intent to testify. In the ensuing discussions, the court presented counsel with a set of choices. The defense could provide a copy of one page of the outline of its opening statement to the prosecution to determine whether the prosecution objected to statements in the outline, or it could reveal defendant's intent to testify, or it could defer the opening statement. As the court told the defense, if the prosecution expressed no objection to the outline, "[T]hen I'm going to leave the opening statement alone." As noted, counsel initially agreed to provide a copy of the page to the prosecution. It was only after his return from lunch that defense counsel

_belief_ that defendant would testify to the communications. (_Hawk, supra,_ 42 Cal.App.3d at p. 121.)  There seems little question that counsel possessed such a belief.

informed the court that defendant would defer his opening statement.

We find no abuse of discretion in the trial court's actions. Defense counsel planned to make assertions in an opening statement that had no disclosed evidentiary source. As the trial court recognized, it was possible that the prosecution would raise ostensibly well-founded objections to these assertions because it was unaware of defendant's intent to testify. Further, the prosecution had previously secured favorable rulings that appeared to cover at least some of the content of the proposed opening statement. From the prosecution's point of view, the assertions would have been improper because they were not supported by evidence that is reasonably available and admissible. (See *Hawk*, *supra*, 42 Cal.App.3d at p. 121.) Such objections, in turn, would have presented the trial court with the choice either of overruling the objections based on the defense's ex parte communications about its trial strategy or sustaining the objections despite its knowledge that defendant planned to testify. Within those confines, the court would have had little choice but to sustain the objections to avoid reliance on confidential ex parte communications. At that point, the defense would have been faced with the decision either of (1) disclosing for the first time to the prosecutor and the jury its plan for defendant to testify, (2) amending its opening statement in light of the sustained objections, or (3) deferring its opening statement. Its choices, in other words, would have been little different from those presented to the defense by the court at the ex parte hearing.

By presenting this set of choices to the defense prior to the commencement of trial, the court sought to avoid the disruption and possible prejudice to defendant that might have occurred

had the objections been raised during defendant's opening statement. A trial judge has broad discretion in controlling the conduct of a trial, and the court's attempt to prevent disruption on the first day of trial was well within that discretion. As the court noted, if the prosecution did not object to the outline, defendant's opening statement could proceed as planned. If the prosecution objected, the defense would need to take account of those objections in the presentation of its opening statement. Had the defense been confident that it could proceed with the opening statement as planned without giving away defendant's intent to testify, it presumably would have been willing to share the outline with the prosecution, as proposed by the court. The defense's decision to defer its opening statement, rather than disclose the outline, suggests that defense counsel recognized that giving the opening statement as planned was inconsistent with preserving the confidentiality of defendant's intent to testify.

Defendant contends the trial court's ruling was an improper interference with defense counsel's tactical decisions. Any interference, however, was within the trial court's broad discretion. The trial court did not prevent defendant from giving an opening statement or calling witnesses. Nor did it order disclosure of defendant's intent to testify or the contents of such testimony. As discussed above, the trial court's ruling merely sought to anticipate and prevent a possible disruption of trial. As a result of the court's diligence, defense counsel had a meaningful opportunity to consider the options the court made available to avoid the disruption, and defendant chose the option of deferring his opening statement until after the prosecution's case. That decision presumably reflected the defense's view of the best tactical course in dealing with the realities of trial,

which made it difficult both to rely on defendant's testimony in opening statement and to keep confidential his intent to testify.

Defendant contends he was prejudiced by the deferral of his opening statement, relying on a contemporary scientific theory of communications. For the reasons discussed above, we find no error in the trial court rulings that led to the deferral of defendant's opening statement, which attempted to accommodate defendant's desire to maintain as confidential his intent to testify under the circumstances. We therefore have no occasion to reach the issue of prejudice.[17]

### 6. *The trial court's discovery sanction was not prejudicial*

Defendant contends the trial court committed a prejudicial abuse of discretion when it imposed a discovery sanction that barred the defense from asking Detective Rodriguez whether, during a pretrial interview with one of the defense attorneys, Rodriguez said defendant told him about Corona's involvement in the solicitation of Montemayor's killing. We find it unnecessary to rule on the propriety of the court's sanction because, even presuming error, there was no prejudice.

Defendant testified that he when he spoke with Rodriguez following his solicitation by Corona, he told Rodriguez "[e]verything that happened, how I met this girl, what she said she was, and what she wanted to happen in Orange County."

---

[17] For similar reasons, we reject defendant's contention that the trial court's action denied him due process of law. Due process did not guarantee defendant the right to rely on the substance of his own testimony in opening statement while preserving the confidentiality of his intention to testify.

When defense counsel asked Rodriguez about the same conversations during his direct testimony, Rodriguez's recollection of the conversations was different. According to Rodriguez, defendant called him to ask if he was interested in "some type of a kidnap for ransom or a murder for hire case." Rodriguez recalled that defendant later said that "big homies" — that is, persons in control of the Mexican Mafia — were involved. When Rodriquez asked defendant "for suspect information and who they thought the victim was going to be," defendant responded that "he didn't really know at that point."

A short time after this testimony, defense counsel asked Rodriguez, "Did you tell [a member of the defense] that [defendant] . . . said that some woman was behind this also trying to get the defendant to do something?" Before Rodriguez was able to answer, the prosecution objected, and the trial court excused the jury. Asked by the court for a foundational offer of proof, defense counsel told the court that Rodriguez spoke to one of his co-counsel "at an earlier date, I think even three years ago." In that conversation, defense counsel told the court, Rodriguez recalled defendant telling him "not only about the big homies but there was some woman involved who was trying to get him . . . to do something." Counsel said that notes were taken of the conversation, although, as discussed below, counsel subsequently recanted that claim.

The prosecutor objected to the introduction of this evidence because the defense had not provided any discovery regarding Rodriguez's communications with defense counsel about his recollection of defendant's statements. The trial court noted that the defense had disclosed two reports concerning its communications with Rodriguez, which the court and the parties had reviewed during a conference immediately prior to

47

Rodriguez's testimony, but "that information is not contained in those documents." The court "accept[ed] the People's representation" that the defense had "not disclosed that to them." Defense counsel acknowledged that this information might "inadvertently" have been "left . . . out."

The court did not believe defense counsel's claim that he had made a good faith effort to comply with discovery obligations, recounting prior instances in which the defense had failed to disclose the contents of communications with Rodriguez and noting that counsel had earlier expressed a reluctance to comply with *Roland v. Superior Court* (2004) 124 Cal.App.4th 154 (*Roland*), then-new case law requiring the disclosure of oral communications by potential witnesses with the defense, including defense counsel. The court expressly found that the failure to disclose "was not a good faith error" and prohibited the defense from inquiring about Rodriguez's communications with the defense about defendant's statements as a "sanction" for failing to comply with *Roland*.

During the subsequent colloquy, defense counsel admitted that he was by no means certain that Rodriquez had ever made the statement attributed to him in the objectionable question. Counsel "thought" co-counsel had mentioned the comment, but he could not find any reference to it in his notes. He said that co-counsel claimed to have heard Rodriguez make the statement again during a meeting they held with Rodriguez the day before. Defense counsel himself, however, did not "remember [Rodriguez] exactly even saying that." As the discussion continued, counsel acknowledged that he was "not sure . . . where exactly I got the information from. My recollection is, my feeling was, it might have [come] from [Rodriguez]." Eventually, counsel conceded, "[T]his might be a lot to do over nothing. He

might not even have said that exactly. I don't know if he said that for sure or not. I'm asking a question, what else was said basically is what I wanted to know."

During subsequent cross-examination by the prosecution, Rodriguez was asked directly whether defendant had told him about Corona or her relationship with Vivar as well as many other details surrounding the proposed killing known to defendant, and Rodriguez responded that defendant had not.

Section 1054.3, subdivision (a), provides in relevant part: "The defendant and his or her attorney shall disclose to the prosecuting attorney: [¶] (1) The names and addresses of persons, other than the defendant he or she intends to call as witnesses at trial, together with any relevant written or recorded statements of those persons, or reports of the statements of those persons." In *Roland*, the Court of Appeal interpreted the phrase "reports of the statements of those persons" to require a defendant (and, reciprocally, the prosecution) to disclose the content of any oral statements made by a disclosed witness to the defense, including those made directly to defense counsel. (§ 1054.3, subd. (a)(1); see *Roland*, *supra*, 124 Cal.App.4th at pp. 165, 167.) Defendant argues we should find the sanction imposed by the trial court improper because (1) *Roland* was incorrect in requiring the disclosure of the content of a witness's oral statements to defense counsel or (2) the trial court abused its discretion in concluding that counsel violated section 1054.3 and in imposing the sanction. We have previously declined to address the propriety of *Roland* when the failure to disclose was harmless. (*Thompson*, *supra*, 1 Cal.5th at p. 1102.)

We decline to resolve defendant's contentions because the trial court's sanction was unquestionably harmless, whether measured by the state law standard of *Watson* or the more exacting federal constitutional standard of *Chapman*. The content of defendant's communications with Rodriguez was unquestionably important to the defense, but the court's sanction in no way prevented counsel from asking about those communications. Rather, the area of inquiry forbidden to the defense was Rodriguez's conversations *with defense counsel* about his communications with defendant. The detective's conversations with defense counsel were irrelevant to the trial, except as a means of impeachment or as an aid to memory. Their potential value in even that role, however, was limited. Because the defense had no notes reflecting Rodriguez's purported comments and counsel disavowed any intent to put co-counsel on the stand to dispute Rodriguez's version, the defense had little ability to challenge a denial by Rodriguez that he made the claimed remarks to co-counsel. In a declaration subsequently submitted to the court, Rodriguez was, in fact, quoted as denying that he had told co-counsel that defendant had mentioned Corona.[18]

---

[18] The denial was contained in a declaration submitted to the court in connection with the prosecution's opposition to defendant's motion to reconsider the denial of a request to recall Rodriguez. In the declaration, an investigator for the prosecution stated: "I told Rodriguez that the defense was now saying that Rodriguez wanted to change his testimony. [¶] Rodriguez rolled his eyes and said that all that happened in the hallway was that [co-counsel] had asked him whether he remembered Navarro telling him, during the pre-October conversations, that a woman was trying to drag him into a crime

Further, the inquiry barred to defense counsel was revealed to be little more than a fishing expedition when he conceded that he did not know whether Rodriguez had ever made the statement attributed to him. As counsel eventually acknowledged, "I don't know if he said that for sure or not. *I'm asking a question, what else was said basically is what I wanted to know*." The court's sanction did not preclude defense counsel from asking that question — "what else was said" by defendant to Rodriguez. Finally, as noted, the prosecution thoroughly explored just that issue on cross-examination, and Rodriguez expressly testified that defendant did not tell him about Corona's relationship with Vivar or her solicitation of the killing. Given these circumstances, the trial court's sanction precluding the defense from asking Rodriguez about his conversation with co-counsel was harmless beyond a reasonable doubt.[19] (*Chapman, supra*, 386 U.S. at p. 24; see *People v. Aledamat* (2019) 8 Cal.5th 1, 3–4.)

---

that had been set up by the big homies. Rodriguez said that he told [co-counsel] 'no,' he did not remember that. Rodriguez said [co-counsel] then asked him 'if it was *possible'* that Navarro had said that to him sometime prior to October. Rodriguez said he told [co-counsel] that he supposed it was literally possible that Navarro had told him that, but that he had no such recollection."

[19] In general terms, defendant contends the trial court's sanction denied him a litany of constitutional rights, including "appellant's right to due process of law under the Fifth and Fourteenth Amendments, his Sixth Amendment right to counsel, and his Eighth Amendment right to a reliable guilt and penalty judgment." For the reasons discussed, we find no violation of defendant's federal constitutional rights.

### 7. *The trial court did not err in excluding defendant's post-arrest statements to Rodriguez*

Defendant contends the trial court erred in excluding statements by Rodriguez regarding a conversation with defendant following defendant's arrest for Montemayor's murder. We find no error.

During redirect of Rodriguez, defense counsel asked about a conversation Rodriguez had with defendant after he was jailed for the Montemayor killing. Following a hearsay objection, the trial court excused the jury and questioned Rodriguez concerning the conversation. Rodriguez said that he went to the jail with the intent of meeting with defendant and "clos[ing] out" the file associated with defendant's work as an informant. During their meeting, defendant explained his presence in jail by reference to his earlier conversations with Rodriguez, saying "[Y]ou remember me telling you about this kidnap case?" Defendant then referred, in Rodriguez's recollection, "specifically [to] a female and . . . the big homies." The mention of a "female" was significant because Rodriguez's and defendant's accounts of their conversations prior to the killing had differed in this respect. Defendant contended he had told Rodriguez about Corona; Rodriguez did not recall defendant mentioning a woman. Defense counsel argued that evidence of defendant's post-arrest statement to Rodriguez should be admitted as a prior consistent statement, but the trial court excluded it as hearsay.

We find no abuse of discretion in the court's ruling. Because defendant's statement to Rodriguez was made *following* his arrest, its primary relevance to the case at hand was to demonstrate that defendant told Rodriguez about Corona when he first contacted Rodriguez — that is, it was being offered

for its truth to bolster defendant's assertion on the stand that he had told Rodriguez about Corona prior to his arrest. The statement was therefore inadmissible hearsay, unless subject to an exception. Evidence Code section 791, subdivision (b) does allow admission of this type of hearsay, a prior consistent statement of a witness, but the exception is available only if "the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (See, e.g., *Dalton*, *supra*, 7 Cal.5th at p. 234.) By the time of defendant's arrest for the Montemayor killing, a motive for fabrication had plainly arisen. We therefore find no abuse of discretion in the trial court's exclusion of the statement as hearsay. (*People v. Edwards* (1991) 54 Cal.3d 787, 820.)

Defendant contends the statement was not hearsay because it was offered to prove that "appellant had disclosed the plot to Rodriguez." The contention does not avoid the hearsay problem. It is true that the statement was not hearsay if the purpose of its admission was to prove that defendant informed Rodriguez of the plot *at the time the statement was made*, after defendant had been jailed. For that purpose, however, the statement was excludable as irrelevant; defendant does not contend that his post-arrest disclosure to Rodriguez had probative value independent of its confirmation of his pre-arrest statements. As defendant acknowledges, "what mattered was that he had told one of his law enforcement handlers about the plot in advance." If admitted for that purpose, however, the

statement was being offered to prove its truth and, as discussed above, was properly excluded as hearsay.[20]

### 8. *The trial court's other challenged evidentiary rulings were largely correct or did not prejudice defendant*

### a. *Defendant's additional hearsay claims fail*

Defendant contends the trial court erroneously sustained hearsay objections to three questions. We find no prejudicial error.

First, defendant contends that the trial court incorrectly sustained a hearsay objection to a question asked of Rodriguez about his encounter with defendant in jail following defendant's arrest for the Montemayor killing. Defense counsel asked, "Did [defendant] confirm that he was [in jail] for this robbery-murder that he was trying to tell you about in July?" Defendant argues that "[n]either the fact that [defendant] had been arrested for a robbery-murder nor the fact that the offense was the same one [defendant] had told Rodriguez about in July or August were offered to prove the truth of those facts but instead to show that [defendant] had made the statements."

We find no abuse of discretion in the court's ruling. As noted above, defendant's post-arrest statements in jail about his earlier conversations with Rodriguez were irrelevant to the trial, except to corroborate his trial testimony about those earlier conversations. Defendant's "confirmation" to Rodriguez that he was in jail in connection with the same incident "that he

---

[20] Because there was no error under state evidence law, defendant's federal constitutional claim fails as well. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1311.) The same is true of each of defendant's unsuccessful claims of evidentiary error.

was trying to tell you about in July" was relevant only to prove that he had told Rodriguez about the possible killing in July, prior to its occurrence. In that role, the confirmation would have been offered to prove its truth. Defendant argues that the statement was offered to prove Rodriguez's knowledge, but the argument does not help his claim. Rodriguez's knowledge of defendant's statement was irrelevant, except to the extent that his knowledge confirmed defendant's making of the statement.

Second, defendant contends, and we agree, that the trial court erred in preventing him, on hearsay grounds, from asking Rodriguez about questions posed by defendant's wife during telephone calls with Rodriguez. Defendant believed that the nature of the questions would demonstrate that his wife was sexually jealous of defendant. We agree with defendant that it is difficult to imagine how the wife's questions could constitute objectionable hearsay. (See, e.g., *People v. Jurado* (2006) 38 Cal.4th 72, 117 ["The request for the gun, by itself, was not hearsay, however, because an out-of-court statement is hearsay only when it is 'offered to prove the truth of the matter stated.' [Citation.] Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated"].) The court's ruling was not, however, prejudicial because defendant was able to obtain equivalent information merely by asking Rodriguez directly whether defendant's wife appeared to be jealous. Rodriguez confirmed that she appeared to be "extremely" jealous. Defendant does not point to any additional material information he was prevented from obtaining by the court's ruling; the only other topic, defendant's relocation to Las Vegas prior to the killing, was proved by other evidence.

Finally, the trial court erred in precluding any inquiry into the nature of telephone calls between defendant's wife and his mother on hearsay grounds. Because the purpose of defendant's questions was not to prove the truth of any particular statement made by either participant during these calls, but rather to show through defendant's wife's comments that she was attempting to find defendant, counsel's questions did not seek hearsay testimony. Through persistence, however, defense counsel was able to establish that the purpose of these calls was to locate defendant. The court's error was therefore harmless.

### b. *The evidence of gang activities was not excessive*

Defendant contends the trial court permitted the admission of "far more gang-related evidence than was necessary for the prosecution's case." We find no abuse of discretion in the trial court's rulings.

Defendant asserts the trial court erred in permitting the gang expert, Detective Booth, to testify regarding certain gang behavior patterns that, he maintains, were not directly raised by the present case — for example, the connection to a particular geographic territory, the ways in which members are admitted to the gang, the value afforded violent acts within the gang, and the manner in which gangs control their territory. Defendant argues that because this was "not a typical gang case," which he characterizes as "a drive-by shooting of rival gangs, or defense of turf, or violence for the sake of intimidation," but instead was a "murder for hire," such evidence served no purpose other than to engender bias.

We find no abuse of discretion in the trial court's refusal to exclude such evidence as more prejudicial than probative under Evidence Code section 352. Although, as defendant

argues, this might not have been the type of crime associated in the public mind with street gangs, it was undoubtedly a product this type of organized crime. Montemayor's killing was accomplished by three men acting in concert, while in regular communication with other interested persons. The motive for the crime was unclear, although various possibilities were raised. Booth's testimony about the behavior of street gangs, the relations among gang members, and their values placed the killers' conduct in context, served to explain why three young men who had no known connection to the victim would commit such a serious crime with no apparent guarantee of financial gain. We find no error in its admission.

### c. The materials seized from Martinez's residence were relevant

Defendant next contends the trial court abused its discretion in permitting the introduction of items seized from the home of one of the killers, Martinez. These items included (1) a paper containing doodles, along with the writings "Crook" and "Pacoima Flats," (2) photographs of Macias and Martinez, and (3) a notebook containing the telephone numbers of Macias and Lopez. Although these materials did not relate directly to defendant, they were probative of the relationships among the individuals and their connection to the Pacoima Flats gang. There was no abuse of discretion in their admission.

### d. The evidence of predicate offenses was not excessive

Defendant also contends the trial court abused its discretion in permitting the prosecutor to introduce evidence of more than the minimum number of predicate offenses necessary to demonstrate a pattern of criminal activity under section 186.22, subdivision (e).

The prosecution alleged a special circumstance under section 190.2, subdivision (a)(22), which requires that the murder occur "while the defendant was an active participant in a criminal street gang" and be "carried out to further the activities of the criminal street gang." As discussed above, a criminal street gang is statutorily defined, in part, as an association of at least three persons who have engaged in "a pattern of criminal gang activity." (§ 186.22, subd. (f).) A pattern of criminal gang activity, in turn, requires a demonstration that the alleged gang has committed "two or more" of a series of specified crimes. (§ 186.22, subd. (e).) In theory, therefore, it was necessary for the prosecution to prove the commission of only two of the listed crimes to demonstrate this element of the special circumstance.

Booth was permitted to testify regarding the commission of three predicate offenses by three different gang members before defendant objected under section 352 that proof of additional predicate offenses was more prejudicial than probative. In ruling on the objection, the trial court first noted that defendant had failed to object to this testimony when it was disclosed in outline form prior to Booth's testimony. The court then denied the objection on the merits, ruling that it was "prepared to give the [prosecution] some latitude" in proving the elements of the special circumstance. Booth then presented evidence of one additional crime, a robbery committed by a fourth gang member.

Defendant argues the trial court abused its discretion in allowing evidence of "twice as many predicate crimes than were needed." We find no abuse of discretion. The prosecution had the burden of proving to the satisfaction of the jury that the Pacoima Flats gang was a criminal street gang, as defined in

section 186.22. As part of that burden, the prosecution was required to demonstrate that the alleged gang had participated in a " 'pattern of criminal activity,' " which required the commission of "two *or more*" of the predicate offenses. (§186.22, subd. (e), italics added.) Two predicate offenses is therefore the minimum that the prosecution was required to prove, but proof of more than the minimum was consistent with this statutory language. Further, the prosecution was required more generally to prove that the Pacoima Flats gang qualified as a " 'criminal street gang,' " defined in part as "any ongoing organization, association, or group . . . having as one of its primary activities the commission of one or more of" the predicate offenses listed in subdivision (e). (§186.22, subd. (f).) In making a case under this provision of subdivision (f), the prosecution may need to introduce more than the bare minimum of predicate offenses to ensure that the jury is provided with a reasonable account of the "primary activities" of the gang. Like the trial court, the courts of appeal have recognized that prosecutors must be given some latitude in this regard and have refused to impose an "artificial" numerical limit on the number of predicate offenses that may be proved. (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1139 [not error to allow proof of eight predicate offenses].)

Section 352 serves as a brake on such proof, limiting it to a number of predicate offenses that is not more prejudicial than necessary to make the case under the elements of section 186.22. We find no abuse of discretion in the trial court's conclusion that evidence of four predicate offenses was not excessive, particularly because there was no contention that any of the predicate offenses mentioned by Booth involved defendant.

9. *The trial court did not abuse its discretion in denying an adjournment to permit counsel to interview an FBI witness*

Defendant contends the trial court erred in declining to delay trial proceedings to give defense counsel an opportunity to interview an FBI agent who had appeared to testify. We find no error.

Defendant called FBI agent Curran Thomerson to testify about defendant's work as an informant. The FBI had declined to make Thomerson available to the parties prior to his appearance to testify. Reports concerning defendant's work with the FBI had been produced to the defense, however, and the parties were informed that Thomerson would be made available to testify concerning the matters disclosed in the reports.

On the morning of Thomerson's testimony, defense counsel was apparently able to speak privately with him for a few minutes prior to the commencement of trial. When the case was called, counsel asked the court for an additional fifteen minutes with Thomerson for the purpose of "see[ing] what areas we are going to concentrate on." The court denied the request, noting that "you already know what testimony you're going to elicit from this witness concerning the relationship of your client to the FBI, and you've been provided adequate discovery for that purpose."

Toward the end of Thomerson's testimony, during a break in the proceedings, the court asked defense counsel whether there was "any area [of testimony] that you think that you haven't had a chance to inquire into." Counsel renewed his request for additional time to speak privately with Thomerson, explaining that he wanted to go over the reports produced to the

defense. Counsel suggested that the court take an early lunch break. The court denied that request, but it permitted defense counsel a "few minutes" with Thomerson to clarify a specific issue identified by counsel. The court explained that counsel's request "to go over the reports . . . in detail with the witness" was denied because, "essentially, I think everything that you wanted to give to the jury in the guilt phase dealing with his relationship with the FBI has, in fact, been presented fully."

Without articulating a specific legal theory or pointing to an offer of proof made in the trial court, defendant contends the trial court's refusal to delay the trial to give counsel additional time with Thomerson "hampered [his] ability to present his defense." We are unaware of any principle of law that would have required the trial court to adjourn the trial to permit counsel to interview Thomerson. The trial court has broad discretion to carry out its "duty" under section 1044 to "control all proceedings during [a criminal] trial, . . . with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044; see *Hernandez*, *supra*, 33 Cal.4th at p. 1048.) Counsel was seeking, in effect, a brief continuance of trial to permit him to interview Thomerson. " '[T]he decision whether or not to grant a continuance of a matter rests within the sound discretion of the trial court. [Citations.] The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked.' " (*People v Fuiava* (2012) 53 Cal.4th 622, 650.) On the other hand, "the trial court may not exercise its discretion 'so as to deprive the defendant or his attorney of a reasonable opportunity to prepare.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 450.)

Defendant has failed to establish that the trial court abused its discretion or violated his constitutional rights by denying the request for a brief continuance. There was no general claim that defendant lacked sufficient time to prepare his defense. The only complaint involved this specific witness, Thomerson. As the trial court found, defendant was provided with detailed reports on the subject of Thomerson's testimony sufficiently in advance to allow preparation. Further, the trial court did permit defense counsel a few minutes with Thomerson in advance of his testimony and an additional opportunity to speak with him regarding the single specific issue about which counsel expressed uncertainty. The trial court merely denied defense counsel the post hoc opportunity to review with the witness the reports of defendant's work to, as counsel phrased it, "find out what else he left out [of the reports]." As defendant concedes in his brief, "[t]here may have been little more that [defense counsel] could have gleaned from meeting with Thomerson." Particularly given defendant's opportunity to review these reports well in advance of Thomerson's appearance and the abundance of evidence introduced relating to defendant's activities as an informant, we find no abuse of discretion in the trial court's decision to push ahead with trial.

Defendant also contends the trial court abused its discretion in denying his motion to admit the entirety of the FBI reports into evidence. Those reports consisted largely of the logs made by law enforcement of their contacts with defendant in the course of his work as an informant. Well in advance of Thomerson's testimony, the trial court told counsel that "the nature and the quality of [defendant's cooperation with law enforcement] is relevant and viable." But the court noted that the logs themselves "appear[] to be unduly time consuming and

not relevant in many respects." Despite the court's request that defense counsel prune the reports to redact extraneous materials, counsel identified for redaction only a recitation of defendant's arrests and mentions of two attorneys suspected of criminal conduct when offering the reports into evidence. Consistent with its earlier expressed concern that the reports "contain[] many entries that are extraneous to the particular case," the court denied the motion, reasoning that "the pertinent portions have been given to the jury in the form of testimony."

We find no abuse of discretion in the trial court's decision to exclude the reports of defendant's activities as an informant. The specific details of his work were, after all, peripheral to the trial. The critical issue was to demonstrate that defendant was, for a significant period of time, a useful and effective informant for law enforcement, and the lengthy testimony of defendant and his handlers conclusively established this. Further, as the trial court noted, the "pertinent portions" of the reports were the subject of live testimony. The additional details contained in the reports were of marginal relevance, and the trial court acted well within its discretion in concluding that this evidence was more likely to distract than inform.

Defendant suggests the trial court's ruling deprived him of a fair trial because it excluded evidence "critical" to his defense. (See *Chambers v. Mississippi* (1973) 410 U.S. 284, 302.) As the trial court noted, however, the pertinent evidence contained in the reports was presented to the jury through the testimony of defendant and his handlers. Defendant identifies no material, let alone critical, evidence contained in the reports that was not the subject of live testimony.

Defendant's appellate brief characterizes the rulings challenged in this section as reflecting the trial court's bias against the defense. Defendant does not attempt to make a serious demonstration of judicial bias, and we find no evidence of bias in the foregoing rulings. "[A] trial court's numerous rulings against a party — even when erroneous — do not establish a charge of judicial bias, especially when they are subject to review." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112.)

Finally, we reject defendant's claim that the challenged evidentiary rulings were cumulatively prejudicial. As discussed above, we have found no significant error in the trial court's rulings, and any errors that did occur had no bearing on the jury's judgment, whether considered alone or together.

### 10. *Defendant's claims of prosecutorial misconduct lack merit*

#### a. *The prosecutor's leading questions were not improper*

Defendant contends the prosecutor committed prejudicial misconduct when he "repeatedly prevented [defendant] from giving complete answers to his questions, engaged in . . . repeated argumentative questions and sarcastic comments, and engaged in questioning which had been precluded in a pretrial hearing." We find no misconduct.

" 'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' [Citation.] 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a

timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 306.) "[T]o establish reversible prosecutorial misconduct a defendant must show that the prosecutor used ' "deceptive or reprehensible methods" ' and that it is reasonably probable that, without such misconduct, an outcome more favorable to the defendant would have resulted." (*People v. Caro* (2019) 7 Cal.5th 463, 510.)

Defendant first cites a series of six leading questions asked during the prosecution's cross-examination of defendant. Each time, the prosecutor, after hearing defendant's negative response to the question, cut defendant off as he tried to explain his denial and moved to strike defendant's partial, attempted explanation. The trial court sustained each request to strike, noting that the defense could allow defendant to explain his answers during redirect examination.

The Attorney General argues defendant forfeited any claim of prosecutorial misconduct by failing to object and request an admonition. Defendant did, however, repeatedly object to the prosecutor's conduct. Because the trial court clearly condoned the prosecutor's approach to cross-examination, any request for an admonition would appear to have been futile. (See *Flores*, *supra*, 9 Cal.5th at p. 403 [defense need not object and request an admonition when to do so would have been futile].)

On the merits, we find no misconduct by the prosecutor, and defendant cites no legal authority suggesting an impropriety. The prosecutor's insistence on a yes or no answer to his leading questions is an accepted convention of cross-

examination. Generally, "[a] witness must give responsive answers to questions, and answers that are not responsive shall be stricken on motion of any party." (Evid. Code, § 766.) When a question calls for a yes or no answer, the attempt to append an explanation to the answer is, strictly speaking, nonresponsive. (E.g., *People v. Davis* (1963) 217 Cal.App.2d 595, 598 ["A general question alluding to a meeting at another 'time' at a given place does not invite the witness to include that which happened on the occasion in his answer. The motion to strike should have been granted as to all that portion of the answer after the word 'yes' "].) The practice can be subject to abuse if, for example, a prosecutor asks questions premised on assumed facts for which the prosecutor has no good faith basis. But that type of abuse is not alleged here. The prosecutor's questions were based on a reasonable reading of the evidentiary record. Defendant was given the opportunity, in the first instance, to deny the questions' implicit accusations. Defendant had the opportunity to explain those denials on redirect examination. In these circumstances, we do not find the prosecutor's conduct to have been so unfair as to deny due process to defendant.

### b. *The prosecutor's allegedly aggressive cross-examination did not rise to the level of misconduct*

As a second example of prosecutorial misconduct, defendant cites a series of questions during the prosecutor's cross-examination of him that, he contends, constituted testimony or were argumentative or sarcastic or "denigrated [defendant's] testimony and character." Defendant failed to preserve this claim by registering an objection on this ground and seeking an admonition. Further, the prosecutor's aggressive questioning did not constitute misconduct.

"A prosecutor is permitted wide scope in the cross-examination of a criminal defendant who elects to take the stand." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1147 (*Gutierrez*).) "When a defendant voluntarily testifies in his own defense the People may 'fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.' " (*People v. Harris* (1981) 28 Cal.3d 935, 953.) Generally, as we explained in *People v. Armstrong* (2019) 6 Cal.5th 735, "A prosecutor may honestly urge that a defendant lied. Convincing the jury that he did so is a potent weapon." (*Id.* at p. 797.)

Defendant forfeited these claims of prosecutorial misconduct. Although defendant did object to many of the questions on evidentiary grounds, he did not do so on grounds of prosecutorial misconduct, nor did he seek an admonition from the court regarding this type of conduct.[21]

---

[21]  As to some of defendant's claims, this failure makes it impossible to determine whether the prosecutor's questions were improper. On one cited instance, the prosecutor attempted to demonstrate that an occasion of cooperation with law enforcement by defendant, which occurred several years before trial, was undertaken for the purpose of gaining leniency. The prosecutor asked, "What actually happened is a couple days later [the arresting officer] went down and talked to a court commissioner that your case was going to be in front of" to secure defendant's release. Defense counsel unsuccessfully objected that "[c]ounsel is testifying," but he did not otherwise contest the question. The question was not improper, however, merely because evidence supporting its factual premise was not at that time contained in the trial record, so long as the

Even if these claims were not forfeited, we would not find this aspect of the prosecutor's manner of cross-examination to constitute misconduct. Defendant provides details of eleven separate incidents. An example is the prosecutor's cross-examination regarding defendant's decision to become an informant. When defendant said he was "tired" of gang life, the prosecutor responded, "So in response to being tired of the gang life, you signed up to be a rat." When defendant said he chose that course rather than moving away because he was not "financially set," the prosecutor responded, "That's a good topic for conversation. Being an informant offer[ed] monetary rewards, didn't it?" Defendant acknowledged that he needed to support himself, to which the prosecutor responded, "Support yourself by turning in friends like Philip Sanchez, is that right?" When defendant answered affirmatively, the prosecutor followed, "Is that how you view this, I'll trade my friends in so I can have a few dollars for myself?"

In a similar vein, when defendant said he did not remember what he meant when writing in a letter, "I got five signatures," the prosecutor responded sarcastically, "Did you go to Dodger Stadium, get the autographs of five ballplayers?" When defendant answered he had no idea what the question meant, the prosecutor asked rhetorically, "If the author doesn't know, how are we to know?" Soon after, when defendant acknowledged that one purpose in writing the letter was to convince the recipient that he was still the *llavero* in his

---

prosecutor had a good faith belief in the truth of the premise. Because defendant did not seek an offer of proof, however, we have no way of knowing the basis for the prosecutor's question and, consequently, have no grounds to evaluate its propriety.

territory, the prosecutor responded, "That's what your whole life was about, was keeping up that appearance, right?" When defendant responded that, no, he was trying to find out information, presumably to relay to law enforcement, the prosecutor again employed sarcasm, asking, "You were very, very motivated to stop crime, weren't you?"

Defendant also highlights "aggressive" cross-examination about his actions immediately following the murder. After defendant acknowledged that, upon first hearing press reports of the Montemayor's killing, he did not contact Starkey or Rodriguez to tell them what he knew, the prosecutor asked, "[W]hy not?" Defendant answered, "I don't know. I don't know." The prosecutor responded, "That's the best you can do for us?" To bring the point home, the prosecutor followed up, "This is your whole defense, isn't it? . . . That you were an informant and you were trying to stop this murder, and somehow you got tossed up in this and you're wrongly accused. Isn't that your defense?" When defendant then said he did not remember whether he called Rodriguez at that time, the prosecutor responded, "Let me give you some time. Think about it. Give us a better answer than that, if you can." The prosecutor followed up, "Isn't it because you were involved in the murder?"

As these examples illustrate, the prosecutor's questions were sometimes sarcastic and aggressive. His approach, however, was not unfair or deceptive. The questions cited by defendant generally constitute fair, if forceful, comment on inconsistencies and improbabilities in his testimony. Accordingly, they were not outside the "wide scope" permitted in the cross-examination of a criminal defendant who elects to take the stand. (*Gutierrez, supra*, 28 Cal.4th at p. 1147.) We find no misconduct.

### c. *The prosecutor's reference to Summer Sherwood was not prejudicial*

During the prosecutor's cross-examination of defendant, the questioning turned to communications between male and female inmates during defendant's pre-trial detention, accomplished using piping in the jail. The prosecutor established that defendant had engaged in the practice and asked whether he still had communications with female inmates. Defendant answered that he had gotten tired of it and stopped. To the prosecutor's inquiry when he stopped, defendant answered, "After speaking to some girl named Summer." The prosecutor took this as a reference to Summer Sherwood, who was eventually sentenced to prison for threatening Corona to discourage her from testifying against defendant in this matter. Upon defendant's answer, the prosecutor responded, "Oh, the girl who went upstate for threatening Mira Corona?" This appears to have been the first mention of Sherwood at trial.

Defendant objected and immediately moved for a mistrial, contending the question constituted "intentional prosecutorial misconduct." In a subsequent colloquy, the prosecutor said that he had no intention of introducing evidence of Sherwood's conviction prior to defendant's mention of her name, but "[N]ow that [defendant] has volunteered his connection to Summer Star Sherwood it was something I was thinking of doing." The court took defendant's motion for a mistrial "under submission" pending the prosecutor's decision. Defense counsel did not ask to strike the question nor seek a jury admonition, and the prosecution never presented further evidence regarding Sherwood.

We agree with defendant that the prosecutor's question appears to have been improper, although we do not accept his proffered rationale. It is "well established that the prosecuting attorney may not interrogate witnesses solely 'for the purpose of getting before the jury the facts inferred therein, together with the insinuations and suggestions they inevitably contained, rather than for the answers which might be given.' " (*People v. Wagner* (1975) 13 Cal.3d 612, 619; see also *People v. Visciotti* (1992) 2 Cal.4th 1, 52 ["a prosecutor may not examine a witness solely to imply or insinuate the truth of the facts about which questions are posed"].) It is clear from the proceedings that the prosecutor had no intention, at the time he questioned defendant, of actually proving Sherwood's crime and demonstrating its relevance to this matter. He appears to have asked the question solely for the improper purpose of suggesting to the jury that the woman with whom defendant acknowledged speaking had been imprisoned for threatening Corona.

Although we recognize that the prosecutor's question was likely improper, it did not constitute prosecutorial misconduct; the question was neither deceptive nor reprehensible, nor did it infect the trial with such unfairness as to render the subsequent conviction a denial of due process. It was a single, unanswered question and an isolated reference to a matter only tangentially related to the issues at trial. It undoubtedly had no effect on the jury's verdict.

### d. *The prosecutor's questions regarding the reason for the killers' assault on defendant were proper*

When defendant was incarcerated awaiting trial, two of the killers, Lopez and Macias, attacked him with homemade blades when the three were placed together in a holding cell. Defendant testified that he had been the subject of a "green

light" — an order from the highest levels of the Mexican Mafia for his death — for some months prior to the Montemayor killing, due to rumors of his work as an informant. He believed the stabbing occurred pursuant to the green light. The prosecution, by contrast, hoped to prove that the assailants had learned of defendant's work as an informant from discovery produced during their murder prosecutions and sought revenge on their own, rather than in response to orders from superiors in the gang. The defense objected to the admission of evidence supporting this theory as speculative and, in proceedings prior to trial, sought to preclude it. The trial court reserved judgment on the admission of the prosecution evidence, but it directed the prosecution not to mention this theory in its opening statement.[22]

The matter came to a head during the prosecution's cross-examination of defendant. The prosecution had changed its theory by this time, postulating that Macias and Lopez sought revenge because they learned from discovery in their prosecutions that defendant had lied to them about the reason for the Montemayor killing. According to the prosecution's revised theory, defendant told them that the order for the killing came from Mexican Mafia leaders, but in fact it was committed "just to curry personal favor with . . . Corona." The court ruled

---

[22] Defendant contends the trial court's comments constituted an in limine ruling precluding the defense from presenting evidence and that the prosecutor's subsequent questions constituted misconduct because they violated this ruling. In fact, the court made no ruling beyond precluding mention of these matters in an opening statement, a ruling with which the prosecution complied. The court deferred to trial any substantive evidentiary rulings on this matter.

that the prosecution would be limited to asking defendant whether he had considered "that the other three co-defendants felt he had lied to them," without permitting mention of the means by which they might have come to that conclusion. When trial resumed, the prosecutor, after asking the permitted question, also asked defendant a series of leading questions premised on the theory that Macias and Lopez had learned defendant had lied to them, although without suggesting the manner in which they might have learned the truth. The court overruled the defense objections, including the claim the questions had not been asked in "good faith."

Assuming the claim has been preserved, we find no misconduct. The prosecutor's questions simply presented to the jury an alternative theory to explain the assailants' conduct, countering the theory articulated by defendant. Because the prosecutor's theory and questions were based on reasonable inferences from the evidence presented at trial, there is no reason to conclude they were asked in bad faith. Further, because the prosecutor avoided asking defendant about the assailants' motives, but simply outlined factual circumstances that might have explained their conduct, the questions did not stray into impermissible speculation.

### e. *The cumulative impact of the prosecutor's conduct was not prejudicial*

Defendant contends the cumulative impact of the prosecutor's misconduct was prejudicial. As discussed above, however, we largely reject defendant's claims of misconduct, either on their merits or because the claims were not preserved. To the limited extent the prosecutor's conduct was improper, it involved issues largely peripheral to defendant's guilt and had no impact on the verdict, under either test for prejudice.

73

### 11. The cumulative impact of the trial court's errors was not prejudicial

We have largely rejected defendant's claims of judicial error. The possible errors we did find — the court's discovery sanction, its erroneous evidentiary rulings, and the admission of evidence in violation of *Sanchez* — were individually minor and had no material cumulative impact on the jury's decision under either test for prejudice.

## B. Penalty Phase Claims

### 1. The evidence of defendant's involvement in prior criminal acts was sufficient to support their admission under section 190.3, factor (b)

"In making its penalty determination, the jury is authorized to consider three types of aggravating evidence, '[t]he circumstances of the crime of which the defendant was convicted in the present proceeding' (§ 190.3, factor (a)), '[t]he presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence' ([§ 190.3], factor (b)), and '[t]he presence . . . of any prior felony conviction' (§ 190.3, factor (c))." (*People v. Johnson* (2016) 62 Cal.4th 600, 645 (*Johnson*).) During the penalty phase, the prosecution presented evidence of several violent criminal acts by defendant under section 190.3, factor (b), including the armed assault at the home of Laurie Fadness and the shooting of mechanic Paul Parent. In addition, the trial court permitted the jury to consider during the penalty phase a letter sent by defendant to a person named "Niño" that purportedly solicited the recipient to commit aggravated assault on another gang member. Regarding the two criminal incidents mentioned, defendant contends there was insufficient evidence of his involvement. As

to the letter, defendant contends there was insufficient evidence that it solicited violence. Although we find sufficient the evidence supporting the two incidents, we agree with defendant there was insufficient evidence to permit the jury to find that the letter solicited aggravated assault. The erroneous admission of that evidence, however, was not prejudicial.

### a. *The assault at the Fadness residence*

During the penalty phase, the prosecution presented testimony by Laurie Fadness and David Gallegos about a violent assault in Fadness's home. When Fadness came home one evening, she found that Gallegos had been badly beaten and his cousin had been shot. As she entered her home, the presumed assailants were scrambling to leave, and she heard a person she knew as "Primo" yell, "Droopy, Jesse, let's go." As Fadness explained, Primo's tone of voice at this time was not "casual." "[I]t was like hollering at him, like, 'Let's go.' " Fadness did not identify defendant as having been present, but she did not have a clear view of all the men as they hurriedly left her home. Gallegos testified that five men entered the house that night, and he identified all of them, without naming defendant; on the contrary, Gallegos testified affirmatively that defendant was not present. Yet when the five entered, Gallegos testified, one of them said to Gallegos's cousin, "Droopy wants to talk to you." The assault began when the cousin responded that he had nothing to say to Droopy.

Defendant contends that this testimony contained insufficient evidence of his involvement in the assault to support its admission as a factor in aggravation under section 190.3, factor (b). As we explained in *People v. Johnson* (2019) 8 Cal.5th 475, "Section 190.3, factor (b) permits the jury to consider the

'presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.'  Before the evidence is presented to the jury, the trial court must determine that the evidence offered would allow a rational trier of fact to decide beyond a reasonable doubt that the defendant committed the criminal activity alleged under factor (b)."  (*Id*. at p. 515.) "We review a trial court's decision to admit evidence of other crimes for abuse of discretion, ' "and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient." '  [Citation.]  'On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt.' "  (*Ibid*.)  " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' "  (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

The jury could have concluded beyond a reasonable doubt that defendant was a participant in the events described by Fadness and Gallego.  The witnesses testified concerning two occasions on which the assailants used the name "Droopy," defendant's gang moniker.  Fadness heard Primo use the name "Droopy" in a manner that suggested he was addressing Droopy directly, urging him to leave.  Gallegos heard one of the assailants tell his cousin, "Droopy wants to talk to you." Although it is true, as defendant contends, that Fadness did not identify defendant as one of those present, it was evident from her testimony that she did not get a clear view of all the participants, who were leaving as she entered.  It is also true that Gallegos denied defendant's presence, but it was for the jury to resolve this apparent contradiction.  The assailants'

references to "Droopy," both of which could be understood to refer to a person present at Fadness's home, constituted sufficient evidence to support the conclusion that defendant was present.[23]

Defendant contends the evidence was insufficient because there was "no evidence that [defendant] was the only Droopy that might have been involved in the drug trade in the San Fernando Valley" and argues that the person who used the name could have been "using [defendant's] name to justify the attack." Defendant's moniker, however, is sufficiently unusual that the jury could have inferred beyond a reasonable doubt that it referred to defendant. Given the distinctive nature of the moniker, it was unnecessary for the prosecution to provide proof that no other gang member in the general area used the name. Further, the suggestion that the assailants were falsely using defendant's name is inconsistent with the remainder of the witnesses' testimony. Gallego's cousin, like defendant, was a member of the Pacoima Flats gang and presumably would have been familiar with defendant.

### b. The Parent shooting

Defendant hired Paul Parent as a mechanic and forced him to live at defendant's home. Parent testified that defendant, often with others, beat him on at least four occasions and broke his finger with a hammer after Parent attempted to leave the

---

[23] Even if defendant were not present, we would be inclined to find sufficient evidence to support the admission of this conduct as factor (b) evidence. The remark "Droopy wants to talk to you" strongly suggests that the assailants were acting at the behest of defendant. As discussed above, defendant held a position of authority within the gang and could direct others to do his bidding.

home. The shooting occurred after defendant had told Parent he would be given defendant's van and allowed to leave if he helped defendant move his home furnishings. Ten minutes after the move was completed, Parent was working under the hood of the van, which was parked near defendant's house, when his cell phone rang. Defendant said, "Rudy is going to shoot you," in a tone of voice, Parent said, "like he just won the lottery." "Two minutes later," Parent was, in fact, shot in the back by Rudy. Parent said that he and Rudy were on friendly terms, but Rudy, like Parent, worked for defendant.

Defendant argues the evidence was insufficient because it is possible that defendant was simply warning defendant that he was about to be shot, rather than being the instigator of the shooting. We conclude that the evidence was sufficient for the jury to find beyond a reasonable doubt that defendant was involved in the shooting. Although defendant's proposed interpretation is plausible in the abstract, to conclude that defendant was simply warning Parent would have been inconsistent with the remainder of Parent's testimony. According to Parent, defendant had kept him a virtual prisoner. On two prior occasions when Parent attempted to leave, defendant enlisted others to help him beat Parent in retaliation. Defendant's ostensible grant to Parent of permission to leave, much less to give him a van in the bargain, was wholly at odds with this prior conduct. Rudy had no evident reason of his own to shoot Parent; the two were on good terms. Further, defendant presumably could have prevented the shooting if he knew of it but did not approve, since Rudy worked for him. When defendant called to alert Parent that he was to be shot, defendant gave no indication of alarm; on the contrary, he was exultant. As Parent said, defendant "warned" Parent in a tone

of voice "like he just won the lottery." Finally, the nearly instantaneous shooting by Rudy strongly suggests that the attack was coordinated with defendant's cell phone call. These circumstances permitted the jury to conclude beyond a reasonable doubt that defendant's call was not intended merely to alert Parent.

### c. The letter sent to Niño

During the guilt phase, the prosecution introduced a letter written by defendant, largely in Spanish, to a person called "Niño." During the penalty phase, the court permitted the jury to consider the letter as evidence of defendant's attempt to solicit an assault against two people named Chino and Sapote by means of force likely to cause great bodily injury under factor (b) of section 190.3. Defendant contends the letter was insufficient in this role because (1) there was no evidence that Niño ever saw the letter, (2) the letter was at most a solicitation of violence, rather than the "use" of violence required by factor (b), and (3) the letter did not clearly solicit criminal violence against Chino and Sapote.

We agree with defendant that the trial court erred in admitting this letter as evidence of the solicitation of violent criminal conduct. Defendant testified that Niño was one of his drug customers, and the letter was intended to shore up his business relationship with Niño at a time when defendant was in jail. It was written largely in Spanish, and the purported references to assaultive conduct were couched in Spanish language idioms that could not be understood literally — for example, "send that Chino dude to the penis" and "hit him in the mother." The prosecution initially sought to translate the letter through defendant, and he rejected the prosecutor's suggestion

that its language solicited violence. Although the prosecution later presented a translation by a qualified Spanish translator, the expert conceded that "to give a completely accurate translation" of the letter "you would have to be very familiar with [the participants'] form of the casual language to know what they are really saying." The intended meaning of the critical phrases in the letter therefore appears too uncertain to permit the jury to conclude that defendant was soliciting Niño to commit aggravated assault. (Contra *People v. Phillips* (1985) 41 Cal.3d 29, 77 (*Phillips*) [written solicitation containing detailed instructions for the abduction of witnesses, as well as "directions to 'knock out,' 'nail' and 'blast' " them]; see also *id.* at p. 76, fn. 30.)

Any error in this respect, however, was harmless under both the state law and constitutional standards for prejudice. (*People v. Casares* (2016) 62 Cal.4th 808, 838; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1170.) As other aggravating factors, the prosecution provided evidence of a series of disturbing acts of violence committed by defendant or coordinated under his direction: the two separate assaults against Gallegos, in one of which Gallegos was shot 14 times by, among others, defendant; the shooting of Gallegos's cousin; five separate assaults on Parent, including defendant's sadistic participation in Parent's shooting; and the kidnapping of Spellman. These were, of course, in addition to defendant's participation in the murder of Montemayor. It strains credulity to argue that, in the face of this evidence, the jury would have found defendant's letter to Niño unduly persuasive in any way. Against a multitude of acts of extraordinary violence, the letter at most *solicited* a violent act. Further, as noted above, the letter was not even clear in seeking violence. Its impact on the

jury's assessment of the appropriate penalty was undoubtedly negligible.  (See, e.g., *Turner, supra,* 10 Cal.5th at p. 827.)

### 2. *The trial court did not err in instructing the jury regarding its consideration of the facts underlying defendant's prior convictions*

Defendant contends the trial court erred when it instructed the jury that it could consider the facts underlying his prior convictions as section 190.3, factor (b) evidence without finding them true beyond a reasonable doubt.

Section 190.3, factor (c) permits the prosecution to introduce evidence of prior felony convictions of a defendant as factors in aggravation.  To the extent the conduct underlying those convictions satisfies the requirements of section 190.3, factor (b), the jury may consider that conduct under factor (b) as well.  (*Homick, supra,* 55 Cal.4th at p. 889 (["A prior felony conviction for a violent crime is 'admissible under section 190.3, factor (b) as proof of criminal activity by' the defendant"].)  Here, defendant stipulated to three prior felony convictions for consideration under factor (c).  In addition, the prosecution introduced evidence of the conduct underlying two of the prior convictions and argued that this conduct could also be considered under factor (b).  The trial court instructed the jury that, in contrast to other factor (b) conduct, it was not required to find beyond a reasonable doubt that this evidence demonstrated criminal conduct because defendant had already been convicted of the charges.

Defendant forfeited this claim when he failed to object to the court's instruction on these grounds.

On the merits, we have consistently declined to decide "whether a reasonable-doubt instruction is required where the

People seek to prove 'conduct' underlying the conviction other than the facts necessarily established." (*People v. Hinton* (2006) 37 Cal.4th 839, 911; *People v. Bacon* (2010) 50 Cal.4th 1082, 1123–1124 (*Bacon*); *People v. Ashmus* (1991) 54 Cal.3d 932, 1000.) In light of defendant's forfeiture, we again decline.[24]

In any event, the court's instruction was unquestionably harmless. It is settled that the jury was entitled to consider the conduct *necessarily* established by the convictions without proof beyond a reasonable doubt. (*Bacon, supra*, 50 Cal.4th at p. 1123.) The details of the conduct underlying these two convictions added little because it did not feature any conduct of a severity beyond that suggested by the elements of the crimes. Further, that conduct — defendant's presence at a gang shooting and his participation in a robbery at knifepoint — added little to the litany of defendant's violent conduct proved under factor (b).

### 3. Defendant forfeited his claim that the trial court erred in failing to consider his ability to pay the levies it imposed

At sentencing, the trial court imposed the statutory maximum restitution fine of $10,000 and a victim restitution payment of $10,433.80. (§ 1202.4, subds. (b), (f).) Then, as now, section 1202.4 permitted a trial court to consider a defendant's ability to pay in setting the amount of a restitution fine above

---

[24] Defendant incorrectly contends that the question was resolved in *Phillips, supra*, 41 Cal.3d 29. Although *Phillips* holds that factor (b) conduct must be proved beyond a reasonable doubt (*id*. at p. 65), it did not consider the particular interaction between factors (b) and (c) presented here. As noted in the text, our decisions subsequent to *Phillips* recognize that we have yet to resolve the issue.

the statutory minimum (*id.*, subd. (c)), while it precluded the court from considering the defendant's ability to pay in setting the amount of victim restitution (*id.*, subd. (g)), which is intended to reimburse a victim's actual economic loss (*id.*, subd. (f)). Without distinguishing between the two types of levy, defendant contends the trial court erred in imposing them without inquiring about his ability to pay, given statements in the probation report suggesting that he was destitute.[25]

Defendant acknowledges that he forfeited this claim when he failed to object to imposition of the levies at sentencing. In *People v. Gamache* (2010) 48 Cal.4th 347, we explained that "the law at the time of . . . sentencing called for the trial court to consider [the defendant's] ability to pay in setting a restitution fine, and [the defendant] could have objected at the time if he believed inadequate consideration was being given to this factor." (*Id.* at p. 409.) We have consistently followed this ruling, most recently in *People v. Miracle* (2018) 6 Cal.5th 318, 356.

Defendant contends that we should find his claims preserved because "[b]oth fines are now subject to reversal" as a result of the Supreme Court's ruling in *Timbs v. Indiana* (2019) __ U.S. __ [139 S.Ct. 682, 203 L.Ed.2d 11] (*Timbs*). Without ruling on the constitutionality of any particular fine, *Timbs* held, as a matter of law, that (1) the excessive fines clause of the Eight Amendment of the federal Constitution applies to the

---

[25] The probation report was somewhat in tension with the testimony at trial, which implied that defendant controlled substantial assets at the time the murder was committed. In light of our resolution of this claim, we need not resolve the apparent conflict.

states through incorporation in the due process clause of the Fourteenth Amendment and (2) the excessive fines clause governs civil in rem forfeitures. (*Id.*, 139 S.Ct. at pp. 689, 690.) Because *Timbs* does not mention forfeiture, it has no direct application here, regardless of the merits of defendant's claim. To the extent defendant claims he was excused from raising an argument under *Timbs* because its application of the excessive fines clause to state proceedings was a novel legal development that could not have been anticipated at the time of his sentencing, thereby excusing his failure to raise the issue (see, e.g., *Perez, supra*, 9 Cal.5th at p. 8), the claim fails. Other portions of the Eighth Amendment have long been held applicable to the states. (E.g., *Louisiana ex rel. Francis v. Resweber* (1947) 329 U.S. 459, 463 [prohibition of cruel and unusual punishment applicable to states].) The argument for extending these rulings to the excessive fines clause was sufficiently obvious that the Supreme Court had already assumed, well before defendant's sentencing, that the entirety of the Eighth Amendment applies to the states. (*Roper v. Simmons* (2005) 543 U.S. 551, 560 ["The Eighth Amendment provides: 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' The provision is applicable to the States through the Fourteenth Amendment."]) The decision in *Timbs* therefore did not relieve defendant of the obligation to raise his challenge to the levies in a timely manner.[26]

---

[26] Alternatively, defendant contends his attorney's performance was deficient in the failure to raise this objection. In the absence of any explanation for counsel's conduct, we

## C. Defendant's Constitutional Challenges to California's Imposition of the Death Penalty Fail

Defendant raises a series of constitutional challenges to California's death penalty statute. He acknowledges that each of these arguments has been rejected by this court in past decisions. As he anticipates, we decline to revisit our prior holdings with respect to these issues, which are listed below. Given the longstanding nature of our rulings, we do not reiterate their rationale.

California's death penalty laws adequately narrow the class of murderers subject to the death penalty. (*People v. Morales* (2020) 10 Cal.5th 76, 112–113 (*Morales*).) In particular, the special circumstances of section 190.2, which render a murderer eligible for the death penalty, are not so numerous and broadly interpreted that they fail adequately to narrow the class of persons eligible for death. (*Johnson*, *supra*, 62 Cal.4th at p. 654–655; *People v. Myles* (2012) 53 Cal.4th 1181, 1224–1225.)

Section 190.3, factor (a), which permits the jury to consider the circumstances of the capital crime in its penalty determination, does not license the jury to impose death in an arbitrary and capricious manner in violation of the United States Constitution. (*People v. Vargas* (2020) 9 Cal.5th 793, 838 (*Vargas*); *People v. Brown* (2004) 33 Cal.4th 382, 401.)

The laws governing imposition of the death penalty are not unconstitutional because they fail to provide "safeguards"

conclude his claim of ineffective assistance of counsel is better raised in a petition for a writ of habeas corpus. (*Johnson*, *supra*, 62 Cal.4th at pp. 653–654.)

urged by defendant to prevent its arbitrary and capricious imposition. In particular, the federal Constitution does not require that the jury agree unanimously on which aggravating factors apply. (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 928; *People v. Lewis* (2008) 43 Cal.4th 415, 533.) The jury need not make written findings regarding the existence of aggravating factors. (*Beck and Cruz, supra*, 8 Cal.5th at p. 671; *People v. Clark* (2011) 52 Cal.4th 856, 1007.) Neither is the death penalty unconstitutional for failing to require findings beyond a reasonable doubt that an aggravating circumstance (other than Penal Code section 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence. (*People v. McDaniel* (2021) 12 Cal.5th 97, 142–148; *People v. Rangel* (2016) 62 Cal.4th 1192, 1235.) Finally, there is no Eighth Amendment requirement that our death penalty procedures provide for intercase proportionality review. (*People v. Morales, supra*, 10 Cal.5th at p. 113; *People v. Lang* (1989) 49 Cal.3d 991, 1043.) These conclusions are not affected by *Apprendi v. New Jersey* (2000) 530 U.S. 466 or *Ring v. Arizona* (2002) 536 U.S. 584. (*People v. Bell* (2019) 7 Cal.5th 70, 131.)

Nor does section 190.3's use of adjectives such as "extreme" and "substantial" in factors (d) and (g), respectively, act as a barrier to the jury's consideration of mitigating evidence, in violation of constitutional commands. (*Vargas, supra*, 9 Cal.5th at p. 838; *People v. Adcox* (1988) 47 Cal.3d 207, 270.) The court was not required to instruct the jury that the statutory mitigating factors are relevant solely to mitigation, and the court's instruction directing the jury to consider "whether or not" certain mitigating factors were present did not invite the jury to use the absence of such factors as an

aggravating circumstance, in violation of state law and the Eighth and Fourteenth Amendments. (*People v. Krebs* (2019) 8 Cal.5th 265, 351; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 123.)

The failure to afford capital defendants the same procedural safeguards at the penalty phase that are afforded to noncapital defendants does not offend equal protection principles, because the two groups are not similarly situated. (*People v. Molano* (2019) 7 Cal.5th 620, 678; *People v. Whalen* (2013) 56 Cal.4th 1, 91.)

California does not regularly use the death penalty as a form of punishment, and " 'its imposition does not violate international norms of decency or the Eighth Amendment's prohibition against cruel and unusual punishment.' " (*People v. Powell* (2018) 5 Cal.5th 921, 965.)

## III. Disposition

For the foregoing reasons, the judgment is affirmed in its entirety.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Navarro

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S165195
**Date Filed:**  October 28, 2021

---

**Court:**  Superior
**County:** Orange
**Judge:** Francisco P. Briseño

---

**Counsel:**

Richard I. Targow, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland and James William Bilderback II, Assistant Attorneys General, A. Natasha Cortina, Christine Friedman and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Richard I. Targow
P.O. Box 1143
Sebastopol, CA 95473
(707) 829-5190

Christine Levingston Bergman
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9159